## The People *vs.* Thomas Gallagher.

The Act approved February 3d, 1855, commonly entitled, "The Prohibitory Liquor Law," so far as it prohibits the sale and manufacture of spirituous liquors is constitutional. (PRATT, J., dissenting.)

There is no reported case in which a Court has declared a law to be void, because it conflicted with some undefined right, not secured by a written Constitution, however valuable that right may have been considered. It is questionable, therefore, whether the Judiciary has power to pronounce an Act void, because it is repugnant to fundamental principles not expressly declared, but necessarily implied in a Republican Constitution. (PRATT, J., dissenting.)

Case reserved from Wayne Circuit.

The defendant sold spirituous liquors without showing that he was a druggist, or that he had any right to sell the same under Section 14 of "An Act to prevent the manufacture and sale of Spirituous and Intoxicating Liquors, as a beverage," approved February 3d, 1855. Although the liquor sold was imported by the defendant, it was not sold in the original package, or in quantities corresponding with the entire contents of such original package, but a small quantity was drawn from each package and sold. For the People, it was contended that this was a clear violation of the prohibitory clause of the Act aforesaid, and that defendant was liable to the penalties of the Act. On the part of the defendant it was contended that the prohibitory clause aforesaid was unconstitutional in two respects: 1. That it was inconsistent with the express terms of the Constitution. 2. That it was repugnant to the fundamental principles necessarily implied in a free Republican Constitution.

*Burt & Maynard, Walkers & Russell,* and *H. C. Knight,* for the People, cited, 25 Verm., 261; 1 Kent Com., 448; 16

Pet., 620; 14 Ill., 196; 5 Metc., 532; Ib., 535; 22 Verm., 74; 25 Ib., 616; 6 Greenl., 412; 7 Gill., 329; 14 Ohio, 594; 2 Scam., 106; 21 Verm., 468; N. H., 535; 13 Manning, 496; 5 Paige, 159; 6 Cranch, 87; 3 Dall., 386; 1 Bald., 74; 15 Wend., 133; 20 Ib., 381; 24 Pick., 357; 2 Rawle, 374; 5 Geo., 107; 1 Doug., 352; 1 Manning, 306; 7 Cush., 94; 7 Cow., 352; Vattel's Law of N., Sec. 253; 9 Wheat., 1; 5 How., 583, 589, 592; 5 Ib., 540; 12 Pick., 193; 7 Cow., 351.

*A. D. Frazer, Geo. V. N. Lothrop, H. D. Terry* and *William Gray,* for defendant, cited, 9 Bac. Ab. Tit. Stat. A., 217; 1 Kent Com., 447; 2 U. S. Cond. Rep., 321; 1 Bay., 98, 252; 9 Gill. & J., 408; 4 Hill, 144; 7 Blackf., 474; 4 McLean, 497; 1 Ohio, 84; 1 Black. Com., 138; 2 Ib., 2; 2 Kent Com., 319; 5 How., 577, 597; 1 N. H., 213; 2 Kent Com., 380; Bacon's Abr., *Tit. Monopoly;* 11 Rep., 86; Godbolt, 254.

By the Court, JOHNSON, J.

The Legislature of this State, by an Act approved February 3d, 1855, prohibited the sale of spirituous and intoxicating liquors as a beverage. The defendant has been convicted under this law, and now insists that the same is unconstitutional. And this is the sole question for our consideration.

Before proceeding to the main question, it may be proper to notice a position taken by defendant's counsel, that this law prohibits the sale of liquors for *all purposes,* insisting that the provisions of section fourteen of said Act, authorizing druggists, under certain restrictions, to sell these liquors for medicinal, mechanical, and sacramental purposes, are in direct conflict with an express provision of the Constitution, enjoining the Legislature from passing any law authorizing the grant of license for the sale of ardent spirits or other intoxicating liquors, and therefore, that the effect of this law,

when *thus* construed in reference to this Constitutional provision, whatever might have been the intention of the Legislature, is an absolute and unqualified prohibition of the sale of all liquors, without reference to the uses and purposes for which they are intended.

Now, we cannot well see how the defendant can avail himself of this question, inasmuch as there is no plea or pretext on his part, that the sale for which he stands convicted was made for any of the purposes specified in said section fourteen. Nor is it by any means certain what effect such a construction would have upon the whole Act; and the inquiry is useless, because we are clearly of the opinion that no such construction can be given to said section.

Up to the time, or near the time, of the adoption of the Constitution of 1850, the license system, so called, had been in force. It was to some extent a source of revenue. It was strenuously urged by the advocates of the cause of temperance, that the Government were thereby giving direct sanction to the traffic, and were in a measure responsible for the supposed public evil which resulted from the use of intoxicating drinks.

This was the evil complained of: that the Government, without any corresponding good, were sanctioning a great moral and public wrong.

The object, then, of the Constitutional Convention, was to put an end to this license system, and it can hardly be supposed that they thereby intended to restrain the Legislature from passing any law regulating the sale of ardent spirits, and, much less, that if any legislation was attempted, it could be no other than an absolute prohibition, yet one of the alternatives must be the result of such a construction, either that no restriction could be imposed, or one absolute in its terms.

If it was the intention that one of these conditions of things should exist, they would have been very likely to have said so, in terms incapable of misconstruction.

Nor can the provisions of section fourteen be construed into anything analogous to a license.

Any person may become a druggist ; (that is, the privilege is open to all), and by complying with the provisions of that section, may sell liquor. It is not by virtue of any permission, but because the disability is not extended to persons engaged in that business.

Therefore, in the examination of this question, we must regard this law as a simple prohibition of the sale of spirituous and intoxicating liquors as a beverage ; and the question is, is the law Constitutional ?

This question has been very ably and elaborately argued by counsel, and nothing which was calculated to throw any light upon the subject, or to aid us in our deliberations, has been omitted. But for *this*, and the deep anxiety of the public mind, presaging so much good or evil as the result of this issue, we should not be justified in any very extended discussion of the subject ; and we protest that we in no manner participate in this public feeling, or public expectation, and have endeavored to decide the question upon the law alone.

The counsel for the defendant insist that this law is in violation of the Constitution, in two points of view : 1. That it is inconsistent with the express terms of that instrument ; but if not, 2. It is repugnant to fundamental ideas and principles necessarily implied in a free Republican Constitution.

The main argument is founded upon the second position ; and it is not a little singular, that there has been no decision yet made, at least none has been cited, and it is believed there is none, which can be regarded as authority upon the subject.

There are, indeed, a great many *dicta* for and against the proposition ; and while on the one hand, it is contended that a general grant of Legislative power to a particular department of Government carries with it the absolute and unqualified sovereignity of the People, and, as a corrollary,

that such sovereignity can be in all cases exercised, unless restricted by the express provisions of the Constitution; it is contended, on the other hand, that there are certain natural rights so intimately blended with our social condition, so sacred in their character, and so essential to the welfare and well-being of society, that, by their own inherent power and virtue, they become exempt from all Legislative encroachments; that these rights are not dependent upon any written law, but are themselves the foundation of all law.

The principal objection to this proposition is the great practical difficulty of defining, with any degree of certainty, what these rights are.

How, and by whom, are they to be settled and defined. In the distribution of power, this duty belongs to some department; if to the Legislature, then the question is settled against the defendant; if to the Judiciary, then there is this practical difficulty, that the Legislature have no criterion by which they can test the validity of their own acts, until the judicial will shall have been expressed.

We do not intend to decide this question, or to express any opinion upon the subject. We deem it unnecessary, in order to dispose of this case; but it may not be out of place to examine the subject a little further.

No light can be thrown upon it by an examination of the English authorities. Parliament is omnipotent, and although it may pass a law in direct violation of every right of the subject, if the language is clear, and incapable of construction, there is no Court in the Kingdom which has the power to pronounce it void. The extent of the power of the Courts is the power of construction, which they will exercise when the law is expressed in doubtful terms, and this is all that is to be understood from the language of Lord Coke in De Bonham's case, reported in the 8 of Coke R., 118.

One of the earliest cases in this country in which this question is discussed, is the case of Calder *vs.* Bull (3 *Dall.*, 386),

which involved the question of the right of the Legislature of the State of Connecticut to set aside a decree of a Judge of Probate, and grant a new hearing. The Court held the Act Constitutional. Justice Chase, in his opinion, says: "I cannot subscribe to the omnipotence of a State Legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the Constitution, or fundamental law of the State." And again he says: "The purposes for which men enter into society will determine the nature and terms of the social compact, and as they are the foundation of Legislative power, they will decide what are the proper objects of it.

In the same case Justice Iredell, in alluding to this decision, takes a different view of it. He says: "If then, a Government composed of Legislative, Executive and Judicial departments, were established by a Constitution which imposed no limits on the Legislative power, the consequence would inevitably be, that whatever the Legislative power chose to enact would be lawfully enacted, and the judicial power could never interpose to pronounce it void. It is true that some speculative jurists have held that a Legislative act against *natural* justice must in itself be void, but I cannot think that any Court of Justice would possess the power to declare it so."

Chancellor Kent, in his Commentaries (1 *Vol.*, 448), says: "The principle in the English Government, that Parliament is omnipotent, does not prevail in the United States. Though if there be no Constitutional objection to a statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power under any other form of Government."

In the case of Cochran *vs.* Van Surley (20 *Wend.*, 382), Senator Verplanck says: "It is difficult, upon any general principles, to limit the omnipotence of the sovereign Legislative power by judicial interposition, except so far as the express words of a written Constitution give that authority. There are indeed many *dicta*, and some great authorities,

32

holding that acts contrary to first principles of right, are void. The principle is unquestionably sound as a governing rule of a Legislature, in relation to its own acts, or even those of a preceding Legislature. It also affords a safe rule of construction for Courts, in the interpretation of laws admitting of any doubtful construction, to presume that the Legislature could not have intended an unequal or unjust operation of its statutes. Such a construction ought never to be given to Legislative language, if it be susceptible of any other more conformable to justice ; but if the words be positive and without ambiguity, I can find no authority for a Court to vacate or repeal the statute on that ground alone. But it is only in express Constitutional provisions limiting Legislative power, and controlling the temporary will of a majority by a permanent and paramount law settled by the deliberate wisdom of the nation, that I can find a safe and solid ground for the authority of Courts of Justice to declare void any Legislature enactments. Any assumption of authority beyond this would be to place in the hands of the Judiciary powers too great and too undefined, either for its own security or the protection of private rights."

In the case of Braddee *vs.* Brownfield (2 *Watts & Serg.*, 271), Sergent, J., says : " But for us to hold a law unconstitutional, it must be a plain violation of some provision contained in the Constitution. It must be an *ex post facto* law, or a law impairing the obligation of contracts, or manifestly in collision with some constitutional provision.

Huston, J., on the same case, remarks : " There are high authorities for saying, there is in every Government somewhere an absolute and despotic power. The exceptions to this are only such as are expressly specified in the written Constitution."

The same doctrine is held in the case of Harvey *vs.* Thomas (10 *Watts*, 63). Gibson, C. J., says in that case : " The most material point in the cause is that which involves

the constitutionality of the statute on which the defendant's right is founded, but it is one about which little need be said. If there is any appearance of solidity in any part of the argument, it is, that the Legislature have not power to authorize an application of another's property to a private purpose, even on compensation made, because there is no express constitutional affirmance of such a power. But who can point out a constitutional disaffirmance of it? The clause by which it is declared that no man's property shall be taken or applied to public use without just compensation made, is a disabling, not an enabling one, and the right would have existed without it."

So in the case of Beauchamp *vs.* The State (6 *Black.*, 299), Justice Dewey, citing the constitutional provision which confers the Legislative powers to a General Assembly consisting of a Senate and House of Representatives, says : "This is not a grant of special, limited, and enumerated powers, implying a negative of all others, as is the case of the Constitution of the United States. The legislative authority in this State is the right to exercise supreme and sovereign power, subject to no restrictions, except those imposed by our own Constitution, by the Federal Constitution, and by the laws and treaties made under it."

So in the case of Doe *ex dem.* Chandler and others *vs.* Douglass (8 *Black.*, 10), Perkins, J., says: "If this Act is unconstitutional, it is because it infringes some restriction upon the Legislative powers of this State, for that power is supreme, except wherein restrictions have been imposed. These restrictions are contained in the Constitution of the United States, of our own State, and in the Ordinance of Congress of 1787, for the government of the Northwest Territory."

On the other hand, Chief Justice Marshall, in the case of Fletcher *vs.* Peck (6 *Cranch*, 87), says : "It may well be

doubted whether the nature of society and government does not prescribe some limits to Legislative power."

And in the case of Wilkinson *vs.* Leland (2 *Pet.*), Justice Story observes, "That Government can scarcely be deemed to be free when the rights of property are left solely dependent upon the will of a Legislative body, without any restraint. The fundamental maxims of a free Government, seem to require that the rights of personal liberty and private property should be held sacred. At least, no Court of Justice in this country would be warranted in assuming that the power to violate and disregard them, a power so repugnant to the common principles of justice and civil liberty, lurked under any general grant of legislative authority, or ought to be implied by any general expression of the will of the people. The people ought not to be presumed to part with rights so vital to their security and well-being, without very strong and direct expression of such intention."

So in the case of the Regents of the University of Maryland *vs.* Williams (9 *Gill. & J.*, 365), C. J. Buchanan says: "Independent of any express restriction in the Constitution of the State, there is a fundamental principle of right and justice inherent in the nature and spirit of the social compact (in this country at least), the character and genius of our Government, the causes from which they sprang, and the purposes for which they were established, and uses alone, and restrains and sets bounds to the power of legislation, which the Legislature cannot pass without exceeding its rightful authority. It is that principle which protects the life, liberty, and property of the citizen from violation in the unjust exercise of Legislative power."

Enough of these contracts have been cited to show how conflicting are the opinions of distinguished jurists upon this question, but they are all *dicta*, and have no force beyond what is due to the opinions of able Judges, and the

reasons upon which they are founded. It will be observed as something peculiar, that in almost all these cases, where the doctrine has been put forth that these rights are inviolable, the Courts have upheld the particular Legislative enactments under consideration, which, admitting the principle, were of questionable validity at least. They seem to be impressed with the necessity of fortifying themselves in their conclusions, and that, although they were compelled to give force and effect to these acts, there might be such a perpetration of Legislative wrong, conflicting with these natural rights, as to challenge the exercise of their Judicial power; a power carefully kept in abeyance to meet any future contingency that might possibly happen.

We said there was no authority upon this point. We meant to be understood simply, that we have been unable to find any case where a Court has declared a statute law to be void because it conflicted with some undefined right, not secured by a written Constitution, however valuable that right may have been considered, unless, indeed, it was upon some principle of construction. And we think the language of the Judges, in the foregoing cases, is subject to some well-grounded criticism. The difficulty, as said before, seems to consist in the inability of any of the Judges who have advanced this doctrine to point out any practical distinction, by which we are to determine which of these rights the Courts will protect and uphold, and which they will leave to the mercy of what they are pleased to term inconsiderate legislation. How are they to be classified? Are they so numerous as to be incapable of specification? Or is it their rarity that gives them that precious importance? If of the former, it must be admitted that the Legislatures have well performed their duty thus far. If of the latter, may we not ask, why have they not been secured by express Constitutional restrictions? These rights, after all, however numerous and important they may be, and we are not disposed

to underrate them, are, and from their very nature must be, to a more or less extent, dependent upon some large discretionary power, and the whole question is solved when we determine where that power exists.

The whole sovereignty of the people is conferred upon the different departments of Government: what the Judiciary and Executive have not, would seem, from necessity, to have been granted to the other; and that other must possess all the powers of a sovereign State, except such as are withheld by the State Constitution, and such as are conceded to the General Government. In that grant there are many powers that are not strictly Legislative, and which are essential to the administration of Government. If this department is limited as a law-making power, what is the limitation upon the exercise of those powers strictly administrative? The rights of the people are much more likely to be compromised in the exercise of *this* power than of the other; and where is the Constitutional check? It must be conceded there is none.

It is said, indeed, that this department cannot cede any of their sovereignty, or, more properly speaking, the sovereignty of the people which they represent, and it may, perhaps, be said, with equal truth, that such an act would be in direct conflict with the express provisions of our Constitution. The general grant to this department of Government was for certain definite objects, which could not be effected if one session of the Legislature had the power to strip its successor of that which is essential to its perpetuity and the effectuation of its ends and purposes,

It is urged that we have no guaranty or security for the preservation of those rights, if they are the subject of unlimited encroachments. Whether *this* be so or not, does not settle the question of power; but unquestionably the ends and objects of a political organization are to be considered in the distribution of powers by which these ends and objects are to be effected; and conceding this to be a legitimate

The People *vs.* Thomas Gallagher.

argument, and it seems to be the main one upon which the defendant relies, what is its real force? It would be pretty difficult to assign any reason why they are not as safe in the hands of one department as another. It may be true that Legislative bodies, acting from temporary impulses, without sufficient time for discussion and deliberation, are more likely to be influenced by the highly excited condition of the public mind, than Courts of law. But the elements of the two bodies are the same—their motives the same: each are acting for themselves and their immediate constituents, to whom they are accountable; besides, over half a century's experience has demonstrated beyond cavil that the apprehension of evil upon *this ground*, if any apprehension ever existed, is utterly unfounded. Great wrongs may undoubtedly be perpetrated by Legislative bodies, but this is only an argument against the exercise of discretionary power. It weighs nothing, for no Government can exist without the existence of that power somewhere. Unfortunately the scheme has never yet been devised by human invention by which the power to do great good has not been mingled with the power to do some evil.

The exercise of a discretionary power, broad and comprehensive enough to meet the exigencies and wants of a great Nation, must carry with it, to some extent, the elements of good and evil. It is not denied but that the Legislative department possesses this discretionary power, to a very great extent; but it is insisted that, when this power shall be improvidently exercised, it becomes the duty of the Court to declare the Act void. That is to say, that all the Acts of the Legislature while representing the sovereignty of the people as a law-making power, which, from the nature of things, must involve the power of a choice, founded upon the wants and necessities of the public, are to be reviewed and passed upon by the Judiciary before they can be considered as of

binding force. And it may well be asked, by what authority does the Judiciary exercise this discretionary supervisory power over an independent department of Government? Certainly not by anything contained in the Constitution, nor by anything that is capable of definition, except, perhaps, in the language of one of the eminent Judges above cited, that it is derived from a fundamental principle of right and justice inherent in the nature and spirit of the social compact, and the character and genius of our Government; this may be very satisfactory to some minds, and perhaps to all; but whether so or not, it is about as clear, definite, and satisfactory, as anything that can be given.

But, conceding 'the doctrine contended for, that there are natural rights which cannot be infringed by Legislative enactment, is the right in question one of that character? The public evils of the intemperate use of ardent spirits, which are the result of an unrestricted use of them, are denied by none. If there can be any difference of opinion upon the subject, it is as to the means best calculated to remove the evil. It is one of a public character. It extends to all classes of society, and adheres to our race with a pertinacity and fatality that would satisfy the mind of the most sceptical that the *evil*, at least, if not the remedy proposed, is *constitutional*. It has long been the subject of deep and anxious study, both with the philanthropist and statesman, by what means, if any, the evil could be abated. It has been for centuries the subject of legislation, and for ages the subject for exhortation; and, after the exhaustion of the one without any satisfactory results, the other has been resorted to. Whether that other will meet the expectation of the public mind, whether it will prove as efficacious in eradicating a great public evil as its fond projectors have anticipated, is a matter about which we need not spend our time in speculation; upon *that* subject there may be a very great difference of opinion. But there

is no difference of opinion about the magnitude of the evil. It is one worthy of the attention of the Legislature; one that peculiarly commends itself to their consideration.

And now, unless the means by which they have attempted to suppress the evil of that extraordinary character as to conflict with these great natural rights, which, for the sake of the argument, we have conceded to exist, the law must be deemed to be in force. The Legislature could scarcely have done less; they said that intemperance was an evil; they saw that the evil was very much aggravated by the unrestricted traffic of intoxicating liquors: and for certain purposes, and to a certain extent, they prohibited that traffic, and *this*, it is insisted, is the exercise of an unconstitutional power. No man is deprived of his property, and no man is prohibited from using his property; and no man is prohibited from selling it, except for certain purposes; but he is prohibited in that respect, because, by so doing, he would inflict a moral injury upon society, and, if a public evil of this character, and of this magnitude, cannot be suppressed by the simple means here resorted to by the Legislature, it may be well said that there is an end to all Legislative power. For we understand that argument to be *this:* The remedy proposed conflicts with our natural rights; these rights are undefined, and of course depend upon their character; but who is to apply the test? Why, the Legislature in the first instance, and if they fail to apply the true one, then it becomes the duty of the Court. Suppose that we should be of the opinion, contrary to that of the Legislature, that this evil did not justify the means resorted to for its suppression, who could not see that the power of the Legislature to pass an ordinary police law depended upon the opinion of the Judiciary as to whether such a law was calculated to prove beneficial to the public; or, in other words, that the validity of the law depended upon the exercise of a discretionary power of the Court; for the whole question turns upon the nature of this

33

right, namely, the *unrestricted right* to sell spirituous and intoxicating liquors. The Legislature has said that no man shall exercise this unrestricted right, no man shall sell liquors to be used as a beverage, because by doing so, he inflicts an injury upon the public ; but, says the defendant, irrespective of the evil, this right to sell liquors is a *natural right*, and you have no power to pass a law infringing that right. How does he prove it? Not by any adjudged cases; there are none : nor by any thing in the Constitution preserving to him this right ; but it is to be determined by the nature and character of the right. And what is the process by which that determination is made? Are we nicely to compare the value of this right with the injury which the exercise of it would inflict upon the public, and strike the balance? Or are we to compare it with other individual rights, which, by the general legislation of the country, have been made subservient to the public interests? It will not be difficult to see that it is of no importance whether the *one* rule or the *other* is adopted ; they both resolve themselves into the same question: a question of policy; a question very suitable and proper for the discussion and deliberation of a Legislative body, but one which cannot be entertained by this Court.

On the whole, we regard the adoption of this law by the Legislature, but the exercise of a power strictly Constitutional.

The judgment, therefore, of the Court below must be affirmed, with costs of suit.

Present, JOHNSON, COPELAND, MARTIN, WING, GREEN, PRATT, and DOUGLASS, J. J.

PRATT, P. J., dissenting.


This is a prosecution against the respondent for a violation of the Act of the Legislature, entitled, "An Act to prevent the manufacture and sale of Spirituous or Intoxicating Liquors," approved February 3, 1855. The *first* section of this Act is

The People *vs.* Thomas Gallagher.

in these words : " That no person shall be allowed to manufacture or sell at any time, by himself, his clerk, servant or agent, directly or indirectly, any spirituous or intoxicating liquors, or any mixed liquors, a part of which is spirituous or intoxicating, except as hereinafter specified."

The only exceptions specified in the Act are : 1. Sellers of drugs and medicines, who shall execute a certain bond ; 2. Liquors of foreign production, which have been imported under the laws of the United States ; and, 3. Cider made from apples, or wine made from grapes, or other fruit grown or gathered by the manufacturer, and free from all intoxicating liquors ; but such cider shall not be sold in a less quantity than ten gallons, or such wine in a less quantity than one gallon.

The *second* section of the Act provides, that all payment for liquors sold shall be deemed to have been received without consideration, and that the money or thing so paid may be recovered back. The *third* and *fourth* sections provide for punishing, by *fine* and *imprisonment*, those who manufacture or sell. And the *sixth* section provides, that no person shall be deemed to have any property in liquors, or the casks containing them, intended for sale, but that the same shall be deemed a public nuisance.

This despotic and highly penal Act of the Legislature was, in argument, claimed to be a mere police regulation. But can it be possible that any man, of the capacity and experience of a school boy, can honestly so consider it ? It is not an Act of mere regulation, nor was it so designed or intended by the Legislature; but it is, to all intents and purposes, an Act of absolute prohibition. This is clear and entirely too plain to admit of doubt, or require discussion.

The Constitutionality of the Act is the only real question presented by the case, or discussed by the counsel at bar. I shall, therefore, in the main, confine myself, in the views I am about to present, to that question, together with some of

the doctrines contained in the opinion of my judicial brethren delivered in this cause, and from which I was constrained to dissent.

That this *prohibitory Act* constitutes a bold and daring invasion of private property, on the part of the Legislature, I have no doubt ; and that the opinion of my judicial brethren, in this cause, contains doctrines which are in direct conflict with fundamental principles, and subversive of our system of Government, is to me clear and susceptible of the most absolute demonstration.

I am aware that it is common for Courts, in deciding an Act of the Legislature to be unconstitutional and void, to apologize, and speak of the peculiar delicacy of their situation. But, without any apology, delicacy or scruple on my part, I shall present my views of the Act in question as a legal right, and as the discharge of a judicial duty legally incumbent upon me ; a duty, the performance of which affords me pleasure, instead of pain or embarrassment : pleasure in being able to place upon the judicial record of the State my solemn protest against the validity of an Act of the Legislature, which my judgment and legal understanding compel me to regard as a most flagrant violation of the natural and vested rights of very many of the citizens of this State.

That liquors, which citizens of the State are now, by the highly penal Act in question, prohibited from manufacturing or vending, constitute property, is a self-evident proposition. They are certainly useful for a thousand purposes, independent of their use as a beverage. This no sane man doubts. The fact is generally, if not universally, conceded by the strongest advocates of prohibition ; and the Legislature, in terms, admits it, and by the Act assumed to make the necessary provisions accordingly. Spirituous liquors are necessary in the prosecution of many of the most valuable arts, as well as for mechanical, manufacturing and medicinal

purposes.   The various medical tinctures in the drug shops throughout the world, which have been devised by medical men of science and skill, and valuable and useful for many of the maladies and ills incident to man, are necessarily prepared and preserved with spirits.

Fermented liquors were manufactured and used by the *antedeluvians.*   Solomon, the man especially endowed by the Almighty with extraordinary wisdom, owned extensive *vineyards,* which he rented to others.   David, the pious *Psalmist,* and chosen King of *Israel,* says : " God causeth wine to make glad the heart of man."   They were also manufactured and freely used in the days of Christ and his Apostles.   Judea, one of the finest countries then known to man, was denominated and known as "The Lord's Vineyard."   St. Paul, a man more honest and profound than any other in the age in which he lived, recommended Timothy to use wine instead of water, for his stomach's sake, and for his often infirmities.   And the Savior, by miracle, supplied wine to increase the festivities on a certain wedding occasion, and he subsequently introduced it as one of the elements of the most sacred *rite* of his religion, and declared that it should be used to the end of the world.   In the yearly stipend of the great John Calvin, for his services as a minister of Jesus Christ, during his entire residence at Geneva, a period of some twenty-two years, two casks of wine were always included, by express stipulation.   According to the account given by Tacitus, a spirituous intoxicating beverage was manufactured out of wheat and barley, and freely used by the "ancient Germans." Spirituous liquors, by distillation, were manufactured and used, as we are informed by history, in the thirteenth century; and brewing, as now practiced, was carried on in England before the expiration of the fifteenth century ; and before the close of the sixteenth century, the use of distilled liquors became common in that country, and was by authority adopted into

the diet of the soldiers, and by them used throughout their campaigns into the Netherlands.

Fermented and distilled liquors, therefore, have been for centuries manufactured, sold, and used as a beverage ; they have largely entered into the commerce of the world, and have been universally considered, and legally held as personal property of use and value. The right of manufacturing, selling, and using as a beverage, has, from the beginning, not only been tolerated, but it has been universally recognized as a natural right throughout the civilized world ; a right which has been for ages, in this and other countries, sanctioned and confirmed by municipal laws, the validity of which have never anywhere been questioned, either by jurists or statesmen. In the United States, from the landing of the Pilgrims down to the present day, fermented and distilled liquors have always, in a popular and legal sense, constituted personal property of use and value, articles of trade and commerce, and have been manufactured and sold, imported and exported, more or less, in every State in the Union. Citizens thus engaged have been protected in their right of property thus acquired, not only by the Constitution and laws of the General Government, but by the Constitution and laws of the respective States, the same as other citizens have been protected in their business pursuits, and in their respective rights of property lawfully acquired. Not only so, they have always been legally subject to seizure and sale for the payment of debts, taxes, fines and penalties, and, like every other species of personal property, they have been the legal subject of personal suits at law and in equity, and when the owner died, they have, in the eye of the law, constituted assets, and as such have been claimed, held, or sold by those representing the deceased, the same in all respects as other assets belonging to the estate ; and no distinction by law has ever been made.

Liquors, then, whether produced by fermentation or distillation, do legally constitute property of use and value; and the owner of this species of personal property, when lawfully acquired, is, upon every principle, and by every consideration, entitled to the possession and use of it. The use legally includes the right of keeping, selling, or giving it away, as the owner may deem proper. This is a natural primary right incident to ownership : a right in which the owner, by the principles of the common law, and by the fundamental principles and maxims upon which our Republican system of Government was founded, is as much entitled to protection as he is in the use of any other personal property lawfully acquired. Is not this so? Will the proposition be disputed by any man who claims even a superficial knowledge of the most simple elementary principles of law and a Republican system of Government? No such unjust distinction is to be found in the Constitution, and it is not to be implied; nor did any such distinction ever exist, in the great fundamental maxims upon which our system of social compact was established. This species of personal property then, is, by the Government and laws, placed upon an equal footing with all other property. And the right of property, lawfully acquired, is one of the natural rights of man, which civil Government was originally instituted to protect its subjects in. This primary object was, among others, expressly enumerated in the first Republican Constitution ever adopted in this country, and the principle has, ever since, been declared and incorporated, in substance, if not in express terms, into every other Republican Constitution which has been framed and adopted on this Continent, and, by common consent and acclamation, it has been proclaimed and adjudged as one of the fundamental maxims of free Government, wherever the "tree of liberty" has been firmly planted.

Under our system of civil compact, each and every citizen has the right to claim and demand of the Government

protection in the unmolested enjoyment of life; liberty, and property. Such are the terms and conditions upon which the compact was agreed to, ratified, and confirmed; and upon which the citizens submit to taxation, and otherwise render their personal services, when necessary, for the support and defence of it. The right and use of private property, when lawfully acquired, is a natural reserved right : a right which has never been surrendered by the people, or in any manner ceded to the Legislature, or any other earthly power, for any purpose whatever, except so far as private property may become necessary for public use, and then it can only be taken on the necessity for its use by the public being first determined by a jury of twelve freeholders residing in the vicinity of the property, and on paying a just compensation therefor. Such are the express stipulations incorporated into the fundamental law of the State, and the Legislature is as much bound by them as any other department of the Government. Any attempt, therefore, on the part of the Legislature, to exercise control over private property, otherwise than thus expressly stipulated, either by the inhibition of its manufacture and sale, or otherwise, is but the assumption of high-handed despotism, and subversive of our civil compact.

But my judicial brethren, in their opinion in this cause, affirming the Constitutionality of this prohibitory Act, entertain a different view, and hold that the power exercised in passing the Act, is a " discretionary power," necessarily vested in the Legislature by legal implication ; and in terms say, "these rights" (natual rights), "after all, however important they may be, are, to a more or less extent, dependent upon some large discretionary power, and the whole question is solved when we determine where that power exists."

" The whole sovereignty of the people is conferred upon the different departments of Government. What the Judiciary and Executive have not, would seem, from necessity,

to have been granted to the other, and that other must possess all the powers of a sovereign State, except as withheld by the State Constitution, and such as are conceded to the General Government."

Can this be so? Is this a rational view, a legal construction of our Constitutional system of Government? Does the Legislature possess such omnipotent sovereign power? Can that body, by mere implication and the exercise of its own discretion, pass any law not inhibited by the Constitution? And can that body, in violation of the established principles and maxims of free government, and express stipulations incorporated into the articles of compact, annihilate primitive rights; pass sumptuary laws; invade or destroy, at will, private property, and decree the manufacture or sale of it a crime, punishable with fine and imprisonment? God forbid! And yet, such appears to be the theory of our Government, as settled by my Judicial brethren, in the final decision of this cause. But to me this doctrine is absolutely absurd, and entirely inconsistent with the whole theory of a Republican system of Government, as settled and declared by the American people. If the theory, settled by the decision in this cause, is sustained and affirmed by the people, the consequences must be pernicious, if not finally fatal to the compact.

Originally, and particularly in the old world, the masses of the people were not only taught to believe, but were, by despotic power, compelled to submit to the degrading political heresy, that all sovereign power, laws and rights were inherent in their sovereign prince or potentate; and that the people, individually or otherwise, possessed no rights or privileges, either social, political or religious, except such as were conferred upon them by the grace and special favor of their sovereign. But this absurd and damnable doctrine was exploded and entirely discarded by the Anglo-Americans before the Revolution. Since that eventful and glorious

period in the history of this country, the true doctrine on that subject has been adopted. It has been definitively settled, affirmed, and a thousand times reaffirmed, that the people are the only rightful sovereigns, and that all political power is inherent in them; and that they do, individually, possess certain primitive rights, in virtue of the great laws of Nature and the gift of Almighty God, which are inherent and indefeasible. That social happiness, religious freedom, life, liberty, and the right of property, honestly accumulated, belongs to this class of rights. And that the great and paramount object of instituting civil Government, is to secure those who enter into it in the enjoyment of these rights. And for the most indubitable and conclusive evidence of the truth of this American theory, we have only to look into the various memorials and resolutions of the American people, and the various speeches and addresses of the American statesmen, immediately preceding 1776; the Declaration of American Independence; the articles of Confederation; the Constitution of the United States, and the several State Constitutions which have since been framed and adopted, in all of which this theory is clearly defined, and these rights fully recognized as inherent and indefeasible in man, and which human government can neither grant nor abolish, alter nor abridge.

If the Legislature, by assumption, or, in other words, by the mere exercise of implied discretionary power, can change or abrogate the well-defined and settled theory of our civil compact, and take away, or otherwise destroy, the natural rights of citizens, then there are no rights which can be regarded as inherent; nor can our system of Government be justly deemed Republican or free. Nor can those composing the minority be any longer certain of protection by Government, or have the least security for the enjoyment of any rights which they may respectively possess; on the contrary, they must stand in no better attitude, irrespective

of the fundamental principles and maxims of free Government, than that of the most abject slaves to the majority, and at all times entirely dependent on the will, whim or caprice of the Senators and Representatives which they may elect, for every right, and for every privilege, political, civil, or religious, they may enjoy. If this is the true condition of those composing the minority, and they have no other or greater security for the enjoyment of life, liberty and property than the will of the Legislature, then, beyond all controversy, our Constitution is but a mythical representation, and our boasted Republican Government is but a mere delusion—a fraud in its inception. But it is not so. The Legislature is not omnipotent. It does not possess the unrestricted sovereign powers claimed for it by Neal Dow and his deluded followers. The people do individually possess certain rights, which are inherent in them, and which neither the Legislature nor any other department of Government can lawfully alter, abrogate or invade; and which should be the pride and glory of every department to defend and preserve untouched.

It is one of the cardinal principles of a Republican system of Government, that its legitimate authority shall be respected and obeyed by the citizens, and that the legitimate rights and privileges of the citizens shall be respected and defended by the Government. This, beyond all doubt, is the true and settled theory of our system of civil compact. Any other would be absurd and inconsistent with its spirit and genius. This theory, in a Republican system of Government, is legally implied, and need never be expressly inserted in the fundamental law. In our State Constitution, however, it is substantially and sufficiently expressed. It stands out clearly and emphatically upon every page of it. But whether it does or not, is entirely immaterial, for it is a settled theory, and, in legal contemplation, constitutes one of the fundamental maxims of free Government in this country; and as such, it

legally enters into, and becomes an integral portion of the entire system. And the Legislature, and every other department, are as much bound by it as the Judicial tribunals of the State are bound by the settled and well-defined maxims of the common law, which for ages have been deemed as fixed and fundamental rules that belong to the universal elements of rational jurisprudence, and which no common law Court of any ability and legal learning would, at this day, assume for a moment to discard or reject as invalid.

The very first rudiments of rational jurisprudence resulted from general consent, or acquiescence ; and when legislation began to act upon it, it was to confirm and add to, and not to supersede or destroy those primitive principles which had, by express or implied consent, been adopted and engrafted into the system as component parts thereof.

And so it is, and so it ever has been in civil government. Neither the Sovereign nor the Legislature of any Government ever organized on the globe, gave origin to its entire system. The principles of natural justice, the obligations of good faith, the protection of life, and the right of private property, must necessarily have been understood, appreciated, and fully recognized by the people, before they could have even desired the organization of any system of civil compact. This must be so ; for men entered into the compact for the avowed and sole purpose of confirming and defending, and not of abrogating or impairing these sacred rights and obligations, thus previously recognized by them as just and valid. The great consideration of the organization is, to secure to themselves more effectually the unmolested and continued enjoyment of these, among other rights and privileges. It is for this that men live and toil. Without it, human life would scarcely be desirable.

The settled and known purposes for which men enter into civil Government are to be necessarily taken into consideration, in construing the articles of compact ; in determining

the terms and conditions upon which it was entered into, and the nature and extent of the powers conferred. This is a fundamental rule, universally adopted in construing the provisions of á Constitution. And it is as necessary as it is to take into consideration the purposes of the Legislature in construing a statute law, or the purposes of the parties in construing personal contracts. That justice and equal rights are among the great purposes of Republican Government, will not be controverted. They constitute the "Magna Charta" of the system, and are held and declared as cardinal principles, which ought always to govern and control the Legislature and other departments. Strict adherence to these great principles is essential and indispensably necessary to the perpetuation of the Government, and for the protection of the lives and property of the citizens. This is a self-evident proposition; for justice cannot be administered, or equal rights conferred by Government, where they are disregarded by those intrusted with the powers of the several departments; nor where Legislative Acts are not within the scope of Legislative power, but are partial, unjust, and oppressive, especially upon those of the minority.

Civil Government is more or less perfect, prosperous, and progressive in its arts and science, agriculture, and commerce, trades and professions, public and private enterprise, morals and religion, and in everything valuable to the world, as it justly and impartially bestows its blessings, and allows its citizens to enjoy all rational liberty, to improve and expand the mind, to select their own pursuits in life, to enjoy their natural rights, to use their property, honestly acquired, as they please, and to embrace such religion and worship God in such a manner as their judgment and conscience may dictate. But when oppressive restraints, unauthorized by the social compact, or the principles and maxims upon which it is founded, are arbitrarily imposed and enforced

upon any portion of the people, the Government cannot prosper, or command the confidence and respect of the citizens; but it must as certainly degencrate into tyranny and crime, as that tame submission to *usurped power* has ever been the malady of human rights and the bane of civil Government.

At the time of the adoption of the present Constitution, extensive, and some very expensive establishments, for the manufacture of fermented and distilled liquors, were in operation in this State. Some of these establishments had been erected and put in operation before the organization of our State Government, by men who had learned the business as a trade. Large sums of money had been expended in their erection, and thousands of dollars were annually paid out to laborers, mechanics and agriculturists, for the necessary labor, materials and stock to carry them on. Yet the subject of *prohibition* was not even mooted in the Convention that framed the Constitution, nor does that instrument impose a single restriction upon the business of that class of our citizens. These manufacturing establishments, at the time of the passage of the Act in question, were not only in operation, but a great number of honest and highly respectable merchants, grocers, inn and hotel keepers, had large sums of money invested in this species of personal property, which they had as honestly and as legally purchased, as any other article of trade purchased by them in their line of business.

The effect of the despotic Act in question, must be apparent to every reflecting mind. It is to destroy the regular business of those engaged in manufacturing; to sink the original investments in buildings, fixtures, machinery, and apparatus, and to render almost entirely valueless the entire stock of liquors which they and all others dealing in this species of property had at the time on hand. Such must be, inevitably, the effect of the Act; for the right to sell is one of the most important and invaluable incidents of personal

property, and especially to manufacturers, merchants, and traders. It is this right that constitutes its whole market value; and, in a pecuniary point of view, there can be no difference to the owner, either in principle or philosophy, whether he is absolutely prohibited from selling it, or whether the value of it to him is destroyed in some other way; whether the value of his property, accumulated by honest industry, is destroyed by an unauthorized Act of the Legislature, or whether he is robbed of it by pirates on the high seas, can make no real difference: the injury inflicted upon him would be the same, in the one case as in the other.

But again : the farmer in this State, under the provisions of this Act, cannot sell his poor neighbor a single gallon of ·new cider, made from the fruit of the orchard planted by his own hand ; nor a single quart of wine manufactured out of the grapes or currants which grew in his own garden, without becoming a criminal, and rendering himself liable to severe and degrading punishment. Did these farmers when they opened the wilderness, cleared away the forest, and planted their orchards, suppose that they were in the end to be thus chained down and degraded ? And can any man of intellect above the beasts of the field, believe that such an Act is Constitutional, valid, and in accordance with the spirit and genius of a Republican system of Government ? It cannot, as appears to me, be possible.

The Act violates natural rights, and divests a portion of our fellow citizens of their legal vested interest in property honestly acquired. It subverts and substantially destroys the trade and business of all those who were, at the time of the passage of the Act, engaged in manufacturing this species. of property. It clearly violates that provision of our State Constitution expressly intended to protect private property. It makes no distinction between liquors on hand before, and those acquired since its passage, but indiscriminately applies to all, and it is, therefore, in its nature and operation, an *ex*

*post facto* law, as it impairs prior vested rights. By it, the Legislature has usurped judicial powers ; passed judgment of condemnation on private property, by decreeing it to be a nuisance, without evidence or even the forms of a trial, and without allowing the owner of the property an opportunity of being heard in his defence. And by it, innocence has been turned into guilt, and severe punishment inflicted upon honest, faithful citizens, for acts authorized by God as well as the fundamental principles upon which the Government itself was established. Not only so, this high-handed, despotic Act violates Government faith and honor to citizens, and is calculated to sunder the political and social ties that bind them to the Government ; to destroy all confidence in Legislative integrity ; and to induce the belief that after all, the Government is not in principle Republican, and that, in fact, it affords the citizens no real protection in the enjoyment of their natural rights, or in the use of their own property. I have, therefore, no doubt whatever, that the Act is unconstitutional and void, and that it should be so adjudged by the judicial branch of the Government.

But let us go a little further. If the Act in question is a valid, subsistent law, then it must necessarily follow, as a legal consequence, that the right of property, honestly accumulated, is not a natural inherent right, but depends entirely on the will and pleasure of the Legislature ; and that the citizen may at any time be deprived of it, by that body, without the judgment or decree of any Court whatever ; and the citizen derives no protection, in the enjoyment or use of it, from the Constitution, or the judicial department of the Government, established under it.

If this is the true construction of our Constitution and Government, then I can only say, in the language of a distinguished jurist : " The wisdom of man could not have devised a more ridiculous piece of mockery, to amuse the people with the semblance of liberty, while its substance is

The People *vs.* Thomas Gallagher.

entirely wanting.   Under the forms and theory of freedom, we have the essence of despotism ; for that man cannot be called free who holds his rights at the pleasure of the Legislature, and with no other security for their continuance than the mere forbearance of that body to invade them."

But let us see for a moment what the Constitution is, and what it is not.   It is, as I understand it, the established form and theory of a Constitutional system of Government ; and its provisions in the main, are only general declarations of fundamental principles which are to govern the different departments in their action.   But it was never designed or intended that this bond of civil compact should expressly specify the extent of each and every power conferred, or the precise restrictions or limitations imposed upon each and every subject matter that might arise.   The great purpose of Government is understood and known ; and it is one of the conditions upon which the compact is entered into, that the Government shall furnish a remedy for all the injuries or wrongs which a citizen may receive in his person or property. This is legally implied, and need never be expressed in the Constitution.   Inherent rights are from nature and nature's God ; but remedies are the invention of men.   In a state of nature, men respectively devise and assert their own remedies, and resort to their own means for protection.   But when they enter into civil compact, to avoid the dangers of anarchy and violence, they surrender the device and assertion of remedies to Government, and rely upon Government for protection in the unmolested enjoyment of their natural rights and privileges.   The Legislature, therefore, may in its discretion, prescribe the mode of protection, and the manner and measures of every remedy ; but cannot take away, abrogate or destroy the rights.

The " Decalogue," written by the finger of infinite wisdom, and in which are incorporated the great fundamental precepts of morality and the Christian religion, contains but ten

35

specifications, as to what a man shall or shall not do : and yet, what would be thought and said of the professed minister of God who should preach the doctrine, that man might morally and religiously do anything and everything not expressly forbidden in the Decalogue?

Mr. Hume said : "That the whole apparatus of Government should have no other ultimate object or purpose than that of the distribution of equal justice. The 'Code Napoleon' even provided for 'previous indemnity,' before the private property of a citizen could be taken or used by Government for any purpose." Chancellor Kent said : "That the duty of protecting every man's property by means of just laws, promptly, uniformly, and impartially administered, is one of the strongest obligations on the part of Government. One of the great objects of the Constitution of the United States was to *establish impartial justice,* and this it has done by the admirable distribution of its powers, and the checks which it has placed on the local legislation of the States. These checks have, already, in their operation, essentially contributed to the protection of the right of property." Judge Story, in his Constitutional Commentaries, says : "It seems to be the general opinion, fortified by a strong current of judicial opinion, that since the American Revolution, no State Government can be presumed to possess the *transcendental sovereignty* to take away the vested rights of property by a mere Legislative Act; that the fundamental maxims of free Government require that the rights of personal liberty and private property should be held sacred." And that the clause in the Constitution of the United States, inhibiting the taking of private property without compensation, "is an affirmance of a great doctrine established by the common law ; and that it is founded in natural equity, and laid down by jurists as a principle of universal law ; and that, in a free Government, almost all other rights would become utterly worthless, if Government possessed an uncontrollable power

over the private property of every citizen." Mr. Webster, in the case of Wilkinson *vs.* Leland, said: "It is of no importance whether there are any restrictions or limitations to the power of the Legislature imposed by the Constitution, for if at this period there is not a general restraint on Legislative power, there is an end to private property." Chief Justice Buchanan said: "Independent of any restrictions in the Constitution, there is a fundamental principle of right and justice, inherent in the nature and spirit of the social compact in this country, in the character and genius of our system of Government, the causes from which they sprung, and the purpose for which they were established, that rises above and restrains and sets bounds to the powers of legislation, which the Legislature cannot pass without exceeding its rightful authority. It is that principle which protects the life, liberty, and property of the citizen from violation in the unjust exercise of Legislative power."

Chief Justice Marshall said: "It may well be doubted whether the nature of society and Government does not prescribe limits to Legislative power; and if any be prescribed, where are they to be found, if the property of the individual citizen, fairly and honestly acquired, is not to be protected?" Justice Chase said, that "He could not submit to the omnipotence of legislation, or that it was absolute or without control, although its authority was not expressly restrained by the Constitution. That Governments are erected to establish justice, to promote the general welfare, to secure the blessings of liberty, and to protect their persons and property from violation. And the purpose for which men enter into society determines the nature, terms, and extent of the compact." Mr. Smith, in his Commentaries on Constitutional Law, says: "It would be assuming too much to suppose that the people intended to delegate any power to be exercised *irrespective* of the original purpose of the social compact, or in any way which would be subversive of its

object and design. The reasonable presumption would be, that the authority delegated must, from necessity, arising from the nature of the design, be limited in its exercise to such acts, and such only, as are calculated to affectuate the original design and purpose of the people when the Government was founded. Whenever the Legislature transcends the bounds of this original authority, or so far disregards the sacred trust committed to it as to pass an act *subversive of natural rights*, ought not such an act to be regarded as exceeding the power delegated? And if so, must not the want of power in the Legislature under such an act invalid, and wholly divest it of the attributes of an imperative Legislative authority?" Justice Bronson said : "What is Legislative power, and how far does it extend? The security of life, liberty, and property, lies at the foundation of the social compact ; and to say that this grant of Legislative power includes the right to attack private property, is equivalent to saying that the people have delegated to their servants the power of defeating one of the great ends for which Governments were established." And Justice Patterson said : "Men have a sense of property ; property is necessary to their subsistence, and correspondent to their natural wants and desires ; its security was one of the primary objects that induced them to unite in society. No man would become a member of community in which he could not enjoy the fruits of his honest labor and industry. The preservation of property is one of the great objects of the social compact, and is a fundamental law. Every person ought to contribute his portion for public purposes, but no one can be called upon to surrender or sacrifice his whole property for the supposed good of community. The English history does not furnish an instance of the kind ; the Parliament, with all its boasted omnipotence, never committed such an outrage on private property. Such an act would be a monster in legislation. In England, a limited Monarchy,

where there is no written Constitution, and where Parliament in its omnipotence can mould it at pleasure, a more sacred regard has ever been paid to private property and its protection by Government than in America, surrrounded as we are with a blaze of political illumination, where the Legislatures are limited, where we have Republican Governments, by which the protection and enjoyment of private property are said to be rendered inviolate."

Such are the opinions of men who rank among the most profound jurists that this country or the world ever produced, and they ought to be worth something; at any rate, to me their views are rational, and in accordance with the principles and maxims, the genius and spirit of our Republican system of Government.

If the doctrine is true, that the Legislature can, by the exercise of an implied discretionary power, pass any law not expressly inhibited by the Constitution, then it is certain that a hundred laws may be enacted by that body, invading directly legitimate business pursuits, impairing and rendering worthless trades and occupations, and destroying the substantial value of private property to the amount of millions of dollars. That body may, by enactment, upon this principle, entirely prohibit the manufacture and sale of gunpowder, fire-arms, dirks, daggers, and bowie-knives, all of which are used for the destruction of human life, and which are the means used for the destruction of thousands annually. It may entirely inhibit the sale and use of arsenic, prussic acid, opium, calomel, and every other kind of drug destructive to life when improperly used. It may also inhibit the manufacture, sale, and use of tobacco and cigars. The consumption of these articles costs the American people millions, and they are, by medical men of science and skill, believed to be injurious to health, and extremely pernicious to the health and habits of young men. It may prescribe particular drinks, and prohibit entirely the use of all others. It may prescribe

some particular kinds of food, and make it criminal to use any other. It may also prescribe one particular mode of preparing food for use, and inhibit every other. A judicious selection of food, as well as a judicious mode of preparing it for use, must be indeed very important to health. It may also prohibit the adoption of the ridiculous and extravagant fashions for dress, which are introduced into this country semi-annually from France and England, to the ruin of thousands. It may also prohibit the manufacture and sale of cards, dice, chess and backgammon boards, because they are sometimes used by gamblers. It may also prohibit the youth of the State from dancing, or the enjoyment of any other youthful recreations, as some persons deem them to be demoralizing in their tendency; and, upon the same principle, and for the same reason, it may prohibit the publication and sale of the miserable yellow-covered novels that are thrown out into circulation at the present time by thousands and tens of thousands. And it may, too, prescribe the mode in which every farmer in the State shall cultivate and till his farm, and entirely prohibit every other mode; prescribe what kind of grain and other produce shall be raised, and prohibit the raising of all other kinds; and prescribe the particular breed of horses, cattle, sheep, and swine that shall be kept on the farm, and under the most severe penalties, prohibit the keeping of all others, and compel them each to raise one or more donkeys annually. Agriculture is a branch of business that cannot be dispensed with; it is more important to the health, happiness, prosperity, and welfare of the whole human family, than any other ever carried on by man since the world began. It is the parent and precursor of all other arts and business. Not less than two hundred millions of men in the world expend their daily toil in its prosecution; at least nine-tenths of the fixed capital of all civilized nations is embarked in this branch of business, and at least a thousand millions of living beings, created in the image of God, are dependent

upon its prosperity for their daily sustenance. And, if the Legislature possesses the omnipotent supervisory power over the business, property, and morals of the people claimed for it, then, in its sweeping reforms, this great and important branch of business should not be overlooked or neglected, as there are no express provisions to be found in the Constitution forbidding the enactment of such laws. But who, I ask, believes that the Legislature possesses the power, or that the people, in their sovereignty, ever intended to confer on that body such unlimited omnipotence? As appears to me, no man of reason and reflection can believe it. The proposition is an absurdity on the face of it, and cannot be supported upon principle or theory. The despotic measures of the mother country, which induced the people of the Colonies to revolt and fly to arms, were not more odious, or inconsistent with every principle of justice, liberty, and equal rights, than the power and measure contended for.

There is another view taken by my judicial brethren, in their opinion in this cause, which I connot consent to pass without noticing. On the subject of *natural rights*, they say: "How, and by whom are they to be settled and defined? In the distribution of power, this duty belongs to some department; if to the Legislature, then the question is settled against the defendant; if to the Judiciary, then there is this practical difficulty : that the Legislatuue have no criterion by which they can test the validity of their own acts until the Judicial will shall have been expressed.

"We do not intend to decide this question, or to express any opinion upon the subject. We deem it unnecessary, in the disposition of this case. But it may not be out of place to examine the subject a little farther.

"No light can be thrown upon it by an examination of the English authorities. Parliament is omnipotent, and although they may pass a law in direct violation of every right of the subject, if the language is clear, and incapable of other con-

struction, there is no Court in the empire which has the power to pronounce it void."

This view to me is, I confess, somewhat novel, and I am not sure that I clearly and distinctly understand its purport; at any rate, I do not understand that the Judiciary of England has no power over an Act of Parliament invading private rights; on the contrary, I do distinctly understand by the history of English jurisprudence, that the Courts of that country, as early as 1667, declared a retrospective Act of Parliament null and void; and that, since that period, other Acts invading the rights of citizens have been so decided. Sir William Blackstone, the great English commentator, and who first gathered together and successfully codified the floating elements of the common law, says: "So great is the regard of the law for private property, that it will not authorize the least violation of it, not even for the good of the whole community. In vain may it be urged, that the good of the individual ought to yield to that of the community. Besides, the public good is in nothing more essentially interested than in the protection of every individual's private rights, etc." But I do not deem this particular question of sufficient importance to pursue it further, or to cite any authority in support of my own view. We are not living or deciding this cause under the Imperial Government of England, but under a Constitutional system of Republican Government, where the three departments are restricted in power by the Constitution, and the fundamental principles and maxims incident to such a system of civil compact.

The Legislature, in its Legislative action, is as much bound by the Constitution and these principles and maxims, as any other delegated authority is bound by the tenor of the commission under which the authority is exercised; and the acts of no agent contrary to the tenor of the power conferred upon him by the principal, was ever binding or valid. For

the same reason, any act of the Legislature, in violation of the-Constitution or the fundamental principles and maxims upon which the Government was established, is absolutely null and void. Such an act is not, and cannot, by construction, be brought within the scope of legitimate Legislative power. But is it to be tolerated that the Legislature is to decide upon the validity of its own act? If so, then when, or in what manner, shall the question be raised before that body for its decision? The Judicial department was designed to stand as a conservative body between the Legislature and the people; and the interpretation of all laws, whether fundamental or statute, is, beyond all controversy, the province of the Courts. The Constitution is the fundamental law of the State. It belongs, therefore, to the Judiciary to give it a construction, to ascertain its true intent and meaning; and it is as much the duty of a Court to do so when it becomes necessary, as it is to give a construction to an act of the Legislature, or to a written contract between individual citizens, when the necessity arises. And a Court, whose duty it becomes to decide on the Constitutionality of an act of the Legislature, is as much bound to take into consideration the great purposes of the compact, and the fundamental principles and maxims of free Government, as it would be to take into consideration the purposes of the Legislature, and the principles and maxims of the common law, in construing a Legislative enactment; or as it would be to take into consideration the purposes of the parties, and the settled rules of law, in giving construction to a contract between individuals. It is, beyond all controversy, the duty of the Judicial department to say what the law is. Those whose duty it is to apply the law to a particular case, must, of necessity, expound and interpret the law. If a statute law violates the Constitution, and both the law and the Constitution apply to a particular case, the duty of the Court is plain, and cannot be avoided. It is, in such a case, the

36

duty of the Court to adhere firmly to the fundamental law, and, without the least delicacy of feeling, pronounce the statute unconstitutional and void. Any other course than this must subvert the Constitution, and reduce our Constitutional Government to a mockery. Most flagrant wrongs upon the natural and vested rights of individual citizens in this country would often have been perpetrated by Legislative enactments, had not the Courts applied the Constitutional tests to their validity, and declared them null and void.

It has been correctly said, " that the waves of the sea do not more certainly wash the shore, than the minds of ambitious men are led to invade the liberties of others." And there appears to be a growing disposition pervading the country to disregard fundamental laws; to overleap their fixed and settled bounds, and to invade the most sacred rights of individual citizens. A disposition so obnoxious to every principle of justice, and so clearly dangerous to the perpetuity of our social system, ought to be met boldly, and resisted firmly, and especially by the Judiciary, whenever and wherever it makes its appearance. Judge Bronson, a profound Constitutional lawyer, in his opinion on the *prohibito y law* of New York, which has recently been declared unconstitutional and void, by the Court of Appeals in that State, says : " A plausible pretext is never wanting for violent measures of this kind. The prevention of intemperance is only one among the number. The public good is always put forward as the end to be attained, and that is so important that no one is allowed to question the means of reaching it. But this is a dangerous principle. Under such pretences the greatest enormities have been committed. The rights of all have been invaded, because some men abuse their privileges. The liberties of the people have been overthrown in many countries under color of promoting the public welfare ; and, under some such pretext, men have even been denied the use of the Bible, and the right to think

for themselves upon the most important of all subjects. The law in question is none the less dangerous because it is specially directed against a class of men, instead of the whole community. That is the usual course in the encroachments of power. The attack commences on the weak points, and proceeds by degrees. It has rarely happened that the privileges of the people have been destroyed in one day, or by a single blow. It becomes us to watch the first step. If other merchants, as well as those who deal in liquors, had been included in the prohibition against selling goods, and the farmer and mechanic had, under some plausible pretext, been denied the right to vend the fruits of their industry, all men would have exclaimed against the rank injustice of the measure. And yet, the title to intoxicating drinks is as perfect as the title is to any other species of property. If we allow the right of a single class to be invaded, no one can be secure that his rights will not fall next." These views of this eminent Judge, thus plainly expressed, are worthy of deep thought. They are based upon the past history of man, and furnish evidence of an enlightened and independent mind. It is true, that, if we tamely submit to have the rights of one class of our fellow men invaded, and their property impaired or destroyed, we cannot tell whose rights or whose property will be next sacrificed.

The powers of our State Government, by the Constitution, are, like the powers of all other Republican Governments, divided into three departments : the Legislative, Executive, and Judicial. No person belonging to one of these departments, can lawfully exercise the powers properly belonging to another. These three co-ordinate branches of the Government are, therefore, distinct and independent. This division of the Governmental powers is founded in wisdom ; it is one of the great safeguards of the entire system. These distinct departments are designed to operate as checks upon each other, neither possessing absolute sovereign power for any

purpose. These check powers, when properly exercised, and fairly and independently carried out by those entrusted with them, render the people secure in their liberty and property. And it should afford those who are entrusted with the powers of one department, pleasure to be able to check those intrusted with the powers of another, in any attempt to exercise power unauthorized by the Constitution, or the fundamental maxims of free Government. " We grant" (says the immortal Marshall), "that the Representatives of the people are the shepherds to preserve and protect the flock ; but they are not exclusively so. If, through inadvertence or design, they should undertake to sacrifice any one or more as victims, it cannot be done so long as the Judiciary remain virtuous, intelligent and independent. But all departments must concur to work iniquity before the people can be *made to mourn, and in their bitterness to curse their Government.*"

The fourteenth section of the Act in question, as I view it, clearly authorizes a grant of license to druggists to sell spirituous liquors, and is, therefore, in violation of Sec. 47, of Art. 4, of the Constitution, which is express that " the Legislature shall not pass any Act authorizing the grant of license for the sale of ardent spirits, or other intoxicating liquors." But, as my views on that question were fully expressed in the opinion delivered by me in the case of "The People *vs.* Collins," I do not deem it necessary to repeat them again here.

That intemperance is a great evil, no sane man can doubt. Nor can any one regret the existence of the evil any more than I do. But the evil, great as it is, can never be remedied in this country by despotic penal laws—laws which are in open violation of private rights, and the principles and maxims of our social compact. Penal laws for the punishment of criminals are necessary, but they have never yet reformed the world, in a moral or religious point of view ; nor will men ever be reformed, or made better, by the use of

The People *vs.* Thomas Gallagher.

such means.   Neither the cause of temperance nor religion can be advanced by political action, or penal laws.

The first temperance society ever organized in the United States, was in the year 1813.   In 1831 there were over 4,000 organized societies, and more than 600,000 members.   In the meantime over 1,000 distilleries had been entirely stopped by their owners ; about 5,000 drunkards had been entirely. reclaimed, and over 1,000,000 of people in the United States were entirely abstaining from the use of all kinds of intoxicating drinks.   From 1824 to 1830, the importation of liquors into the United States was reduced by temperance efforts, 4,189,747 gallons ; and during the year 1830, over two hundred vessels sailed from American ports without provision of spirits.   But the fate of these societies was sealed, when they were induced by political demagogues, in conjunction with fanatical clergymen, to enter the political field, and take political action as a party.   This was but the natural consequence of such a course of action.   The cause, instead of being benefited by it, was ruined : the moral influence of the societies entirely paralyzed, by party, political action, and political proscription.

That the Legislature has the power, by enactment, to regulate the traffic in liquors, as far forth as a police regulation can be legally extended, I have no doubt ; but, beyond that, it is entirely powerless—as I trust, for the safety of individual citizens, it may ever remain.