### The People on relation of Daniel S. Twitchell v. Amos C. Blodgett.

*Voting — where ballot must be cast.* — The provision of the Constitution (*Sec.* 1, *Art.* vii,) "That no citizen or inhabitant shall be an elector, or entitled to vote at ·any election, ·unless he has resided in the township or ward in which he offers to vote, ten days next preceding such election," was designed, and has the effect to require that each elector shall *in person* cast his ballot in such township or ward.

*Soldiers' voting Law.* — The act of February 5, 1864, (*Laws of* 1864, *p.* 40,) known as the soldiers' voting law, is in conflict with said provision of the Constitution, and is, therefore, void.

The source and object of a State Constitution, and the proper rules for its construction discussed per CAMPBELL and COOLEY J. J.

The doctrine laid down in the case of *Sears v. Cottrell*, 5 *Mich.*, 250, as to the general purposes of a State Constitution, and the extent of legislative powers under it reaffirmed, per CHRISTIANCY J.

*Argued January* 26. *Decided January* 28.

Information in the· nature of a *quo warranto.*

*Albert Williams,* Attorney General, and *H. C. Knight,* and *Alfred Russell,* for the People:

1. The powers of this Court in relation to constitutional questions, and the conditions on which they would declare an act of the legislature unconstitutional, have been more than once passed upon and clearly defined in the published reports of their decisions. Upon these points this Court has taken the same views with other Courts of the highest authority.

It will be seen, by consulting the cases, that, whilst the Legislature doubtless ought, as a political duty, to

hesitate to enact a statute of which there may be reasonable doubt as to its being constitutional, the Court, on the other hand, will not assume an attribute of sovereignty, of which there are reasonable and well-founded doubts, by abrogating a legislative act. — *Sears v. Cottrell*, 5 *Mich.*, 251, 256; *People v. Gallagher*, 4 *Mich.*, 244; *Scott v. Smart's Executor*, 1 *Mich.*, 306, 307; *Sill v. Village of Corning*, 15 *N. Y.*, 303.

2. Under the principles well established in the cases above cited, and repeatedly declared in those quoted below, it may be affirmed, without the slightest misgivings or qualifications, that when the place and manner of holding elections are not prescribed by the constitution, they are within the discretion of the Legislature, and the reception of votes from persons actually being out of their election district or the State, might be authorized by statute. This is admitted expressly, or clearly implied in the opinions of the Courts in the several States in which decisions have been rendered upon this subject. — 11 *Law Reg.*, p. 462.

3. Is this question left to the legislative discretion in Michigan?

The constitution of Michigan confers general law-making power upon the Legislature, prescribes the qualifications of electors, but does not prescribe the particular mode of applying the vote to the decision of elections in the townships and wards, and, therefore, leaves it to the legislative authority. — *Const., Art.* 7, §1.

The provisions of our constitution, then, being express with reference to the general qualifications of the voter, but containing no restrictive clause with regard to the place of actually offering the ballot, is it *necessarily implied* from any of the express provisions that the *place of voting* is a test of qualification, or in other words, that the bodily presence of the elector is specified?

The citizen of Michigan who enters the army cer-

tainly does not lose his residence or rights · of citizen-
ship; and if he can reach his home on the day of an
election he may then vote in the usual mode. — *Const.*,
*Art.* 7, §5.

Was it contemplated by the convention that the citi-
zen who performs the very highest functions of citizenship
should, by that very act, be wholly disfranchised? Be-
cause one thing may not have been "dreamed of" by
the convention, it is not to be inferred that the opposite
was contemplated.

The question, then, is whether such soldier-citizen can
cast his vote in his proper township or ward without
being bodily present therein, if the Legislature so pro-
vide.

It should be remarked that our constitution and laws
contemplate that the Government may rely upon all able-
bodied citizens for its defense in war, and call upon
them imperatively. If there should be an invasion near
the time of an election, and all well-affected men should
take arms and fly to the defense of their country, the
traitors and base fellows might seize upon the power of
the State, and create a revolution, if there was no way
for the true citizens to exercise the right of voting.
Surely, the framers of our organic law are not to be
presumed to have contemplated such an absurdity.

It may be fairly presumed, further, that the constitu-
tional convention had a reason for the particular lan-
guage employed in the provision for soldiers neither
gaining nor losing their residence. They intended clearly
that a soldier should not be deprived of any right by
reason of his involuntary location in any place other
than his residence.

The same body which prescribed the qualifications of
voters, and *under that head* prescribed that they should
be considered as such qualified electors only of the town-
ship or ward of their residence, also took care to provide

expressly that they should not lose such residence by their involuntary location under superior orders. Why this care, if they were to be forbidden the possibility of the use of their qualifications whilst thus subject to superior command.

The Courts recognize fully the *effect of different wording* in the constitutions of the several States, and those which have felt themselves obliged to overrule laws of this character, have done so on the strength of the peculiar language of their own constitution. —*See the cases above cited.*

The Court in Iowa have well considered this point, and sustained their own statute, not because there was any peculiar language in the constitution *permitting it*, but because there was no peculiar language in that instrument *forbidding it*. They held that the omission of certain restrictive clauses in the constitution of other States was to be credited to an intelligent design, and express the opinion that the constitution of Michigan is, in this respect, similar to that of Iowa. —*Morrison v. Springer*, 12 *Law Reg.*, 280–3.

The express and evident object of *Sec.* 1, *Art.* 7, of our constitution is to prescribe the *qualifications of electors*. After doing so generally, it is added, in the nature of a proviso, that they shall not be deemed such electors in any other district than that of their residence. The alternative is *any other township or ward ;* that the soldier's vote shall be received and have effect in the township or ward of his residence. It was intended to prohibit the practice of voting for State officers, etc., in some other district, and to prevent soldiers, sailors, etc., influencing and controlling the local government of places where they happened to be, as had often been attempted, on the one hand, and to preserve the full franchise of citizenship at their proper place of residence, on the other. There is no attempt to prescribe anything

concerning the single fact of the bodily presence of the person. The substantial provision is, that the residence of the elector shall have been in his township or ward ten days, and not that he shall vote in any particular manner. —*Morrison v. Springer*, 12 *Law Reg.*, 285.

We maintain that the act of voting in a township or ward is the expressing, in legal form, of a choice for officers of such township or ward, and that it does not include in its essential definition the idea of the personal locality of the actor; and that confining the offering to vote, and the consequent act of voting, to the township or ward of the elector's residence, is intended simply to exclude his vote being received and having legal power in any other ward or township. The essential idea is, that he shall vote for officers of his own district, and not for those of another. This is the affirmative and negative of the proposition, and exhausts its legal meaning.

The strict meaning of the constitution of Michigan is, that the qualified elector shall be deemed such qualified elector in the district of his residence, and not that he shall only exercise his right in a particular mode of manual delivery of a ballot within said district. — *Vide Wisconsin Ms. opinion.*

The Vermont and New Hampshire Courts go upon the strict letter of their constitutions, and affirm the perfect legality of the votes cast by soldiers for Members of Congress, and Electors of President and Vice President beyond the borders of their States. They thus perfectly establish our definition of the act of voting, and our demand that nothing shall be inferred beyond the clear provisions of the constitution. — *Vermont Pamphlet opinion;* 13 *Law Reg.*, 161 *note.*

*G. V. N. Lothrop* and *T. Romeyn*, for respondent:

1. It is the duty of the Court to construe the constitution according to *the thought which* it expresses; to

interpret it in the light of its language, its history, its policy, and its practical and received construction; to give effect to what it forbids or enacts, by *implication*, as well as directly and expressly; and different parts of it are to be weighed and compared, and, if possible, effect is to be given to each and all. If its thought, intent and language, thus construed, are inconsistent with the provisions of an act of the Legislature, the latter must be declared invalid. — See *Marbury v. Madison*, 1 *Cranch*, 137 ; *Gibbons v. Ogden*, 9 *Wheat.*, 188 ; *Newell v. People*, 7 *New York*, 97 ; 1 *Doug. Mich.*, 354, *Green v. Graves ;* 1 *Mich.*, 118, *Brooks v. Hill ;* 2 *Mich.*, 587, *Southworth v. Palmyra and Jackson R. R. Co. ;* 3 *Mich.*, 67, *Teft v. Teft ;* 5 *Mich.*, 53, *Chappee v. Thomas ;* 5 *Mich.*, 251, *Sears v. Cottrell ;* 5 *Mich.*, 417, *Chandler v. Nash ;* 7 *Mich.*, 345, *Streeter v. Paton ;* 8 *Mich.*, 274, *Woodbridge v. City of Detroit ;* 8 *Mich.*, 333, *Tyler v. The People ;* 11 *Mich.*, 120, *Parsons v. Russell ;* 11 *Mich.*, 139, *Ames v. Port Huron Log. Co.*

It would seem unnecessary to cite so many cases to establish elementary principles, but in the debates on the passage of this bill all the elements involved in the above decisions were assailed.

2. The constitution of Michigan, by a fair construction of its language, and comparison of its different provisions, requires that the voter shall deposit *his ballot in person*, in the township or ward in which he shall have *actually resided* ten days before the election.

And *a fortiori* it inhibits voting beyond the State.

First. The *history* of the constitution shows this.— See *Constitution of* 1835, *Art.* 2 ; *Laws of* 1838, *p.* 268.

The amendments in constitution of 1850, *Art.* 7, *Sec.* 1, were intended to embody these restrictions.

And then look at the *practice* under this, as evinced by the legislation of 1851, and by usage contemporaneous and continued.

TWITCHELL v. BLODGETT.

Second. The *language* used in this first section of article seven can have no other fair and natural construction.

It first declares the *general qualifications* of electors; and then, in the last sentence, restricts the exercise of the right by adding, first, that the elector must be above twenty-one years old; second, he must have resided in the State for three months next preceding the election; third, he must have resided in a certain township or ward ten days next preceding the election; fourth, such residence must be in the township or ward *in which he offers to vote.*

Voting must be by *ballot.*—*Sec* 2. *Art.* 7.

The deposit of the ballot is a *personal* act, and cannot be done by proxy.

This is plain elementary law. It was so at common law, and the authorities for it are fully cited in the New Hampshire case.—11 *Law Reg.* 742; 41 *N. H.* 551.

No one will question that the constitution is to be construed in reference to the common law, and that it was adopted in view of its principles and phraseology.

Then, when a soldier brings and deposits his vote on the shores of the Atlantic or the banks of the Tennessee, is that *offering to vote in a ward in Detroit?*

Certainly, such construction of the language used is forced and unnatural.

This fifth section confers no privilege and removes no restriction. It simply preserves the residence, and enables the party, if he be in the locality, to offer his vote in the proper township or ward.

This construction forces no word nor phrase from its appropriate and natural meaning, and it gives effect to each and all.

3. Other provisions of the constitution plainly indicate that its framers contemplated the personal presence of the elector at the ballot box, and in the township or ward where the election should be in fact held.

TWITCHELL *v.* BLODGETT.

First. It is plain that the *general scope and purport* of the constitution are to. make. all *officers* elective in and from the locality of their residence.

Second. The elections are to be held in counties for county officers, and in townships for township officers.— *See Art.* 10, *Secs.* 1, 3, *etc. ; Art.* 11 ; *Art.* 6, *Secs.* 6, 13, 16, 17.

Third. Officers are to reside within the limits of their official districts.

Fourth. The provisions for the protection of electors show that . the constitution. contemplated voting within the State, and the personal presence of the voter at the time.— *See Art.* 7, *Secs.* 3 *and* 4.

4. An examination of other State constitutions shows that the words used in the constitution . of Michigan are to. be construed as restricting the right to vote to the place where .the elector personally offers his ballot, and where the right of voting is, in fact, exercised.

For a statement of. these, and for the argument to be deduced, from them, I refer to the opinion of Sawyer, Judge, in the case of *Bourland v. Hildreth,* in California, recently. decided. . This case is . the subject of comment and approval in .13 *Law Register, p.* 161.

5. The adjudged cases are decidedly in favor of our construction.

The first case we cite is that of *Chase v. Miller,* 41 *Penn.,* 403, .11 *Law Register,* 146. Next, see Connecticut case, 11 *Law Register,* 460, 30 *Conn.,* 591. Next, New Hampshire case, 11 *Law Register,* 740. Next, Vermont case, opinion of *Judge Grier,* 1st April, 1864. Next, Iowa case, *Morrison v. Springer,* 12 *Law Register,* 276.

It will be observed that this case is *faintly* sustained by the Iowa reporter; that it is pointedly condemned in the California case, which last, in 13 *Law Register,* 161, is . highly commended by Mr. Redfield; and, finally, that

it proceeds upon a distinction between the words, "*claims to vote*," and "*offers to vote*," which, in fact, makes its conclusions in our favor.

We last cite the California case, of *Bourland v. Hildreth*, and the comments on it, in 13 *Law Register*, 161.

6. While other State constitutions, reviewed in these decisions, differ somewhat in language from ours, it is evident that the *principles* of these decisions cover our case. The question is one of ascertaining, from all the various elements of construction, the true intention of the constitution; and we confidently submit that, in all material things connected with the qualifications of electors, and the exercise of the elective franchise, the constitution intended to prescribe and direct, and to leave the Legislature no power, beyond that of regulating the formal details of recording and contesting, and canvassing votes.

The form of the vote is fixed — must be a ballot. The *times* of holding elections are designated.

Is it possible that the constitution intended that the Legislature might authorize polls to be opened in the State prison, in an alms-house, or in a seminary of learning, for the convenience of their respective inmates, to have their votes counted in the canvass of remote counties?

CAMPBELL J.:

The relator caused this information to be filed, claiming that, at the election in the fall of 1864, he received a majority of the legal votes for the office of Prosecuting Attorney for the county of Washtenaw. The incumbent, according to the agreed statement of facts, received a majority on the home vote; and the county canvassers, rejecting the soldiers' vote, gave him a certificate of election. Had the vote of the soldiers been counted, Twitchell would have been found elected. The regularity of the vote is not disputed, and the only

question presented for our decision is, whether the act of the Legislature authorizing the soldiers in the field to vote out of their own townships is constitutional. If the law is valid, Twitchell is entitled to the office. If it is invalid, the incumbent has a right to retain it.

The argument has been extended, and has presented a great variety of considerations, which have been urged upon us as proper to govern our action. The importance of the question, as determining upon the voting privileges of a large number of electors, is obvious, and a resort to every appropriate source of light upon the subject is not only permissible, but necessary to a just and complete performance of duty. But the wide range of argument necessarily opened in the case, renders it proper to indicate an opinion to some extent upon the proper sources of information, in order that no misapprehension may arise concerning what may be regarded as legitimate elements of decision.

The case is happily free from one class of questions which sometimes may introduce confusion. The ordinary disputes, concerning the distribution of power between the people and their various departments and agencies of Government, do not arise in the present controversy. It is conceded that the power of regulating the time and manner of elections, and the places where they may be held, is one which is legislative in its nature, and belongs to that body which is entrusted with the general legislative authority, unless the constitution has limited or destroyed their control over it. And we are only concerned, therefore, in determining whether the constitution of Michigan has prevented the State Legislature from exercising complete control over the locality of elections, and whether, if such control is limited, the limitation is applicable to the subject before us.

It was not contended on the argument that, if the constitution is silent on the subject, the Legislature may

not allow the citizens of Michigan to vote beyond its limits. Whether the State can provide such safeguards against abuse abroad as it can at home, cannot govern legislative action on such a matter. If there is no constitutional prohibition, the legislature must determine for itself whether the importance of securing the privilege of voting to its citizens abroad is overbalanced by the difficulty of enforcing all the safeguards against abuse, which may be enforced at home in all cases. The sanctions and penalties which are not required by the constitution may be dispensed with, if that be deemed expedient. So far, it is a mere question of policy, whether they shall be required. We are not in this case called upon to decide whether the State could, or could not, enforce the several duties or penalties prescribed in the act, should its provisions have been disobeyed, and it would have been needless to refer to the subject of extra-territorial action at all, had it not entered into the consideration of other Courts in dealing with this general subject. The concessions made on the argument render it unnecessary to consider at all the limits of extra-territorial action; and they may, therefore, be regarded as unimportant in disposing of this case.

We have had cited before us several decisions of different State Courts, upon provisions of their own constitutions, supposed to be more or less like ours, and we are asked to follow them as authority. Upon questions of this nature, such decisions can only be valuable from their intrinsic weight and force of argument. They have all been made since our own constitution was adopted. They are all dependent upon their own local regulations, and are placed upon grounds which savor more or less of their own local customs and ideas. Even where two constitutions contain the same phrase or its equivalent, it is quite possible that the context may show that it does not mean the same thing in both. None of the decisions

13 MICH.—J.

produced before us have any bearing upon the present controversy, except those in Iowa, California and Pennsylvania. The Courts of California and Iowa disagree upon the effect of a phrase identical in the constitutions of both States. The clause construed by the Supreme Court of Pennsylvania is more nearly like the principal clause in our constitution which has been discussed before us; but considerations are introduced into the discussion which do not all exist in Michigan. While it is to be hoped we have been able to profit by the arguments and suggestions of those learned tribunals, we are nevertheless forced to determine, according to our own deliberate conclusions, what effect is to be given to our own constitution.

It is not necessary to cite or discuss the various rules of construction which have been from time to time suggested by Courts. They are all designed to aid us in determining what the exact meaning of the constitution is. While men may not always agree in their opinions, there can be but one true meaning to any constitutional provision, and it is the duty of a Court to determine, upon its own responsibility, what that true meaning is. If a law is to be tested by the constitution, it is the duty, therefore, of the Court to make such a decision as accords with its carefully formed and settled convictions, after using all accessible means of enlightenment. The meaning of our constitution was fixed when it was adopted, and the question which is now before us is not different from what it would have been had the constitution been recently adopted. These charters of government are adopted by the people for their own guidance, as well as for the guidance of the governments which they establish. They are designed to provide for contingencies not foreseen, as well as those which are foreseen. It usually happens that their founders are more provident than they themselves imagined at the time of their action. When

they act upon sound general rules this is almost always the case. It can hardly be supposed that the framers of the constitution of the United States regarded it as possible that the integrity of the Union should have been as rudely assailed as it has been; and yet the constitution has proved to be as well adapted to the present exigencies as to those of the early days of the Republic. But it may easily happen that specific provisions may, in unforeseen emergencies, turn out to have been inexpedient. This does not make these provisions any less binding. Constitutions can not be changed by events alone. They remain binding as the acts of the people in their sovereign capacity, as the framers of Government, until they are amended or abrogated by the action prescribed by the authority which created them. It is not competent for any department of the Government to change a constitution, or declare it changed, simply because it appears ill adapted to a new state of things.

If the people, in establishing their Government, see fit to place restrictions upon the exercise of any privilege, it must be assumed that in their view the exercise of the privilege without the restriction would be inexpedient and dangerous, and would not, therefore, have been permitted. Every restriction imposed by the constitution must be considered as something which was designed to guard the public welfare, and it would be a violation of duty to give it any less than the fair and legitimate force which its terms require. What the people have said they design, they have an absolute and paramount right to have respected. It is as clearly their will as any of their grants of authority or privilege, and must be construed in the same spirit, and neither extended nor curtailed by any considerations except such as tend to show its true meaning. Restrictions have, it is true, been found more likely than grants to be unsuited to unforeseen circumstances. Chief Justice Marshall, in *McCulloch v. The*

_State of Maryland,_ 4 _Wh. R._ 424, has pointed out with great clearness the danger of making constitutional provisions too specific; and it has been forced very unpleasantly on the attention of our people, by the improvident restrictions on legislation which have hampered us under the constitution we are now considering. But, where evils arise from the application of such regulations, their force cannot be denied or evaded; and the remedy consists in repeal or amendment, and not in false constructions.

But I am not able to yield my assent to an argument which was forcibly urged upon us, that in construing a constitution we must not take into the account the existing state of things, which is so different from anything which has gone before. That the constitution means nothing now that it did not mean when it was adopted, I regard as true beyond doubt. But it must be regarded as meant to apply to the present state of things, as well as to all other past or future circumstances. Its real intent, like that of all other laws and public instruments, can be only determined when facts exist which call for its determination. It is not an abstraction, but a charter for human government, and it must be construed with reference to realities, and not interpreted as if it had no such bearing. The rules of law, are supposed to be permanent, and capable of settlement by the Courts; and yet, when a Court announces a principle which is foreign to the case before it, the eminence of the Judges, and their acknowledged ability, will not obtain for that announcement the respect which belongs to the rest of the decision, because, when applied thereafter to existing facts, it may be found that the Judges have not seen the matter in all its bearings, and, had they done so, would have come to a different conclusion. No opinion which is merely speculative, can ever be re ceived as entirely reliable. No Court ever refuses to

allow its mere *dicta* to be re-considered, and I should be very unwilling to be bound by any such remark of my own, as I should certainly decline to receive as obligatory any irrelevant opinion of others. To strive to dissever a legal and constitutional provision from the only facts which justify a Court in construing it, would — if such a severance were possible — lead to no good result. The constitution must be read as applicable to present circumstances, for the simple reason that it was established for all subsequent circumstances and times; and we must give it the same force it would receive had its language been recently adopted, in full view of present emergencies, and must give to its terms their fair and natural meaning, in view of the whole tenor of the instrument, so far as it relates to the subject in controversy.

As to the manner in which a constitution should be construed, it is hardly necessary to say much, as the rules which are familiar to all jurists are not so much technical rules of law, as suggestions, to aid in ascertaining the true meaning, which is the only object of any attempt at construction. But some reference to the source and objects of a State constitution, may indicate the spirit with which it should be approached. It proceeds from the people in their original capacity, as the source of all power in the Government. Their will being the supreme law, and only to be found in the constitution which they ordain, must be fairly and cheerfully enforced according to its terms, and no attempt should be made to evade or defeat it. The constitution, although drawn up by a convention, derives no vitality from its framers, but depends for its force entirely upon the popular vote. Being designed for the popular judgment, and owing its existence to the popular approval, its language must receive such a construction as is most consistent with plain, common sense, unaffected by any passing excite-

ment or prejudice. We are not to speculate how the people would have acted under other circumstances, or whether they would have bound themselves in the same way, had their minds anticipated the future. We must only determine how they saw fit to act with their sober judgment, taking upon themselves such consequences as their action might bring forth in the future. The constitution is eminently a popular instrument, binding according to its terms, and requiring for their interpretation such rules as will not warp its sense from what its language shows it probably appeared to those who adopted it.

There has been no practical construction which can throw any light upon the question before us. The fact that election laws have been made on a certain basis, which does not accord with the principle of this bill, is of no weight, because there has never before been any occasion for such a bill. Whatever value practical construction has, depends entirely upon its being an open, notorious and consistent course, upon a question now mooted. Practice, not involving the mooted question, is no index of construction. We have never before had occasion to provide for voting in any unusual way on State affairs.

We are, therefore, thrown back upon the constitution itself, to expound it according to its own tenor, in the light of such previous historical facts as may legitimately aid to elucidate it.

The provision of the constitution which is supposed to be violated by the laws under which the relator claims to have his title to office established, is the first section of article seven, concerning " elections." This clause provides that every white male citizen, etc., " shall be an elector, and entitled to vote ; but no citizen or inhabitant shall be an elector, *or entitled to vote at any election*, unless he shall be above the age

of twenty-one years, *and has resided in this State three months, and in the township or ward in which he offers to vote, ten days next preceding such election."* The next section provides that all votes shall be given by ballot, except for such township officers as may be authorized by law to be otherwise chosen. Further sections provide against loss of residence by absence on military service, and contain some other safeguards against electors being prevented from attending elections, and for preserving the purity of elections.

It is claimed by the relator that offering to vote at an election in a township or ward, does not prevent casting the vote beyond the State limits, while the respondent insists that the act of the elector must be done within his own township.

To determine which is the correct conclusion, we must first see what provisions in this section concerning elections are too plain to be questioned. By examining the section, we find that it makes provision for every possible election which can be held at all, under the authority of the State. "No citizen or inhabitant shall be an elector, *or entitled to vote at any election,*" unless he shall come within the subsequent provisions. In the next place, every election must be in some township or ward; for the voter, in order to "*vote at any election,*" must "*offer to vote*" in the "*township or ward*" in which he has resided "*ten days next preceding such election.*" Whether he gives in his vote on the spot, or whether it is given, in fact, somewhere else, to become, by some legal construction, a vote in the township, he must vote at the election in the township, or not at all; for, thus far, there is no possibility of misconstruction. Again, the place *in which he offers to vote* is, of necessity, the place where he votes, if the offer is acceded to; for the offer must be made to some one authorized to accept it, and when accepted, the vote

is complete. For the vote is, by this section, made the act of the elector himself, and when his offered ballot is accepted, there is no other act which he can perform to make it operative. That the township is a necessary place for the vital purposes of the law, is manifest; for no offer to vote in any other township but that of the voter's residence, is permitted by the constitution. And, it being a necessary place for election purposes, and the only place which is referred to, it may be necessary to consider what purposes are to be subserved by any rules of locality. For we cannot be permitted to suppose that a restriction has been imposed without necessity, or without meaning; neither are we at liberty to disregard any word or phrase which has been inserted in the supreme law of the State.

It has not been denied by any one, nor do I think it can be reasonably doubted, that the first impression any one would receive from reading this section, would be that the voter must attend the election in his own township. Nor can it be any more doubted that the ordinary means for preventing fraudulent voting by ballot require such presence. The reason for allowing voting by ballot, instead of *viva voce*, has always been claimed to be, that the voter by ballot might preserve secrecy as to his vote, and thus escape the danger of oppressive influences. But be this as it may, a ballot, once cast, furnishes no means of identifying the voter, who, by voting *viva voce*, is seen and recognized by all present. Unless, therefore, there is some other means of identifying him, there is no security against false and illegal voting. If the voter is required to present himself personally at his own place of abode, his neighbors will know his person, and will be likely to know his qualifications. If he can vote elsewhere, and have his vote transmitted or counted in the township, he may or may not be known personally to those who are where

he is. found, but they are by no means likely to know his actual residence, nor, if he violates the law, can his crime be as readily identified or proven.   That other means of protection may be devised is possible; but the test by neighboring eye-witnesses has always been the favorite resort of the law, and it is the best.   But it is sufficient for my present purpose to know that, whether the best or not, it is simple and valuable. The interpretation, then, which holds that the clause requiring voting to be in the township of the voter's residence, was meant to secure his presence where he is known, is not only the primary and natural inference, but is also founded on a reason which is of some weight in securing the purity of elections, which is one of the prominent purposes of the article containing the section in controversy.

The other view which is taken of this section must equally hold that the idea of locality, for some purpose, is imperative.   The township of the voter's residence is a necessary element in every election.   The elector must " *offer to vote*" in that township.   If this does not mean that he is to vote there in person, then some other satisfactory meaning must be presented.   This secondary meaning, in order to command our respect, must possess several qualities.   It must, in the first place, be a natural meaning, such as the words fairly suggest; for the language is ordinary language; and, by every rule of construction, must be used in an ordinary sense.   In the second place, it must be such as to make the provision subserve some useful purpose, in protecting elections; for it would be nothing short of absurd to hold that a voter's rights were solemnly restricted by a useless provision, which the legislative authority cannot rescind or vary.   Constitutions are not to be construed as meant for any but solemn and valuable purposes.   And thirdly, it must be such as to subserve the purposes indicated

by the constitution better and more completely than any other meaning.

The only other meaning which has been suggested is that the constitution merely intends to provide that the vote shall *take effect* in the township where the voter resides. This phrase does not, to my mind, convey a very clear impression, but the intention seems to be that the vote shall have the same effect as if it had been actually cast there. It cannot be claimed that any less than this will satisfy the constitution, for the voter must *offer to vote in that township*, and of course nowhere else. The language is exclusive. This construction appears to me to be inadmissible on several grounds. It is not a natural construction, and does not give reasonable value to the words used. It provides for a constructive voting, when the constitution requires expressly an actual vote by ballot somewhere, and allows no place for the election but the township. When the voters have all cast their ballots the election has been held, and if this has been done in Tennessee, and the votes are afterwards allowed in a township here, the election has nevertheless been held, and the voter has voted in Tennessee. The vote must take effect as a vote at the election, on the day and at the place where the constitution has fixed the election. I cannot appreciate the force of an interpretation which ignores the actual vote and the actual election day as the time of its operation, and finds no office for the place solemnly appointed by the constitution for the holding of an election, except as a place in which the votes given at an election held on the regular election day somewhere else shall be considered to have been given by a legal fiction.

But if the words will authorize an interpretation which will permit a fictitious presence and vote, it is not easy to discover how any good end can be secured by counting the votes in one township rather than

another. For the election of township officers they might be available, but these officers need not, under the constitution, be elected by ballot; so that the provision could not have been designed for that purpose. For any but town officers, the votes may be much more conveniently counted in the district electing them; as there must always be a district canvass. Such votes can in no sense be said to take effect in the township; and it is inconceivable that such a purpose could have ever been deemed worthy of being insured by a constitutional provision.

If, as I have already endeavored to show, a constitutional provision must, if possible, be considered as designed for some reasonable and useful purpose, for the well-being of the State, and if a natural meaning, plain, and obvious, and consistent, and useful, suggests itself, I cannot justify myself in discarding it for one which, to my mind, seems far fetched and unnatural, and which can serve no useful purpose whatever, affecting, or dependent on, the locality which has been so absolutely required by the constitution to be the place of the legal election.

I have given my views at length on the constitutional question, as a mere matter of construction, because the provision has been differently applied by a department of the Government whose action we are called upon to review, and the case is one of more than usual importance. And a decent respect for that important body required that the reasons of any adverse decision should be fully given. Had not the nature of the difficulty demanded this, I should have felt it my duty to rely only on the historical proofs bearing on the subject. This constitution is merely the successor, and supposed improvement of a former one, and is not the origin of our State Government. By our first constitution it was provided that no "citizen or inhabitant should be entitled

to vote except in the district, county, or township in which he shall actually reside at the time of such election." This provision is, in all important respects, like the one under consideration, except that it does not confine the vote to the township. Under it any one could vote for any officer in whose district he resided, in any part of the district, which might include the entire State or any lesser territory, Three years' experience of this brought about the necessity for a change; and we know, as a matter of history, that the evils experienced grew out of the difficulty of identifying legal voters, and the facility of double voting. In 1838 an amendment was proposed, and subsequently adopted, in these words: "That so much of the first section of the second article of the constitution as prescribes *the place in which an elector may vote*, and which is in these words, to wit: 'district, county, or township,' be abolished, and that the following be substituted in the place thereof, to wit: *township or ward.*" — *R. S.*, 1846, *pp.* 19–30. — Here we have the construction by the people themselves, as authors of the constitution, declaring this provision to be one of *place*, and making a change could be of no avail whatever except on that supposition. The present constitutional restriction is found in the same section, and expresses the same idea, whatever that idea may be. I cannot, therefore, attach to it any other meaning than that the voter must cast his vote personally, in his own township or ward. And I am, therefore, compelled to declare that in my opinion the act of the Legislature authorizing voting on a different basis is invalid.

Public duty will not permit me, as a magistrate, to offer excuses for performing an unavoidable office. If our constitution deprives of the privilege of voting a class of men to whom we are largely indebted for having the right preserved to ourselves, the only remedy is to invoke the people to amend a restriction which has become too narrow for complete justice.

TWITCHELL *v.* BLODGETT.

CHRISTIANCY J.:

The single question presented in this case is the con-stitutionality of the act to enable the qualified electors of this State in the military service' to vote at certain elections, approved February 5, 1864.

But, though a single question, it is one of the first magnitude; and considering the great national crisis which led to its enactment, the great number of officers whose election depends upon its validity, and its unfortunate connection with the party politics of the day, it may be safely said that no question has arisen in our Courts, since the organization of the State, which has excited so much public interest, or so generally enlisted the patriotic impulses, the passions and the prejudices of the people.

These considerations admonish us that, in approaching so grave a question at such a time, it is our duty, as judges, to guard with great vigilance against the effects of all such excitements, and of all extraneous considerations upon our own minds, that we may decide the question, as one purely of constitutional law.

In this view it becomes not less important to determine what the question is *not*, than what it *is*. The question, then, is not whether in our view upon broad principles of justice and patriotism the electors who have volunteered or been called into the field, and are absent from the State in the public service, ought to be allowed a voice in the government of the country, for the preservation of which they are risking their lives, but whether the constitution of the State has prohibited the Legislature from extending to them that right while thus absent. The question is not whether the constitution ought to have permitted the exercise of this power, but whether by a fair construction of the language of the instrument as framed by the convention, and understood and adopted by the people, the power in question has

been prohibited. Our province is not to make or modify the constitution, according to our views of justice or expediency, but to ascertain, as far as we are able, the true intent and purpose of the constitution which the people have deemed it just and expedient to adopt. This we, in common with the people and all departments of the Government, are bound to obey in all its provisions, however unwise in our opinion they may be, so so long as it remains in force. Considerations of justice or expediency, therefore, can have no bearing upon any question of constitutional power, except so far as they may tend when the meaning is otherwise doubtful, to throw light upon the probable intention of the people in its adoption.

It can never be wise or expedient for the judiciary, however pressing the exigency may appear, to disregard the plain principles of the organic law which the people in their sovereign capacity have seen fit to adopt as the great landmarks for the ascertainment and security of public and private rights. The duty, therefore, of courts of final resort, to declare an act of the Legislature unconstitutional and void, when it plainly conflicts with the constitution, is clear and imperative. But it is not to be forgotten that this is the highest and most solemn exercise of judicial power. The legislative, equally with the judicial power, is established by the constitution; and, within the limits fixed by that instrument, that power is independent of the judiciary and of all other departments. The members of the Legislature and the Governor are sworn to support the constitution. They must, in the first instance, necessarily judge of the constitutional validity of their acts. It is not to be supposed that they have lightly disregarded its provisions; and their judgment is entitled to some degree of respect. Hence, as I had occasion to remark in the case of *Sears v. Cottrell* (5 *Mich.*, 259 *and* 260,) no rule of construction is

better settled in this country, both upon principle and authority, than that the acts of a State Legislature are to be presumed constitutional until the contrary is shown; and it is only when they manifestly infringe some provisions of the constitution that they can be declared void for that reason. In case of doubt, every presumption, not clearly inconsistent with the language or subject matter, is to be made in favor of the constitutionality of the act. The power of declaring laws unconstitutional should be exercised with extreme caution, and never where serious doubt exists as to the conflict. *Foster et al., v. Essex Bank,* 16 *Mass.* 245; *Fletcher v. Peck,* 6 *Cranch* 87; *Ex parte McCollum,* 1 *Cow.* 564; *Clark v. The People,* 26 *Wend.* 599; *Ins. Co. v. City of New York,* 5 *Sandf.* 10; *Lane v. Dorman,* 3 *Scammon* 238; *Morris v. The People,* 3 *Denio* 381; *Newell v. The People,* 3 *Seld.* 109; *Flint River S. B. Co. v. Foster,* 5 *Geo.* 194; *Green v. Graves,* 1 *Doug. Mich.* 352. (*See also Sharpless' v. Mayor of Philadelphia,* 21 *Pa.* 162 to 164.) "These rules are founded in the best of reasons, because, while the supreme judicial power may interfere to prevent the legislative and other departments from exceeding their powers, no tribunal has yet been devised to check the encroachments of the judicial power itself."

But it has been strenuously insisted here that these principles can only properly apply when the doubt exists as to the construction of the act, and not where it arises upon the meaning of a constitutional provision; that it is in all cases the duty of the Court first to fix and settle the meaning, definitely, of the constitution, whatever may be their doubts upon it, and then to examine the act and apply it to the constitution.

Now, it strikes me, as a self-evident proposition, that the question whether a legislative act conflicts with the constitution, must, of necessity, equally involve the examination of both. And that, while it can make but little

practical difference which is first examined and construed, the more logical order, when it is claimed that an act is unconstitutional, would be first to determine what the act is. Nor can I perceive any good ground for holding that the doubt which is to restrain us from pronouncing the act unconstitutional, must be confined to the meaning of the act; nor why courts can be bound to settle, fix, and declare the meaning of the one, in spite of their doubts, more than of the other. The doubt which is to save the act, is the doubt of the conflict; and this may arise alike from the construction of the one or the other, or both.

In fact, it will be found that, in much the greater number of cases where the rules above cited have been laid down, the doubts arise upon the construction of the constitution, and not upon that of the act which was claimed to conflict with it.

It is important, also, in a case of this kind, to notice the general purposes of a State constitution. As I had occasion to notice these also in the case above cited, and as I have seen no reason to change the views there expressed, I cannot do better than to reiterate them here:

"The purpose and object of a State constitution are not to make specific grants of legislative power, but to limit that power where it would otherwise be general or unlimited; as well as to impose certain duties upon the Legislature and other departments. And generally it will be found that, in our State constitution, like those of other States, powers are not specifically or expressly given, except in consequence of some express limitation, which might otherwise be deemed to prohibit the power in question.

"Without any limitation of the legislative power in our Constitution, that power would have been at least as absolute and unlimited within the borders of the State

as that of the Parliament in England, subject only to the Constitution of the United States. The simple creation by a State constitution of the legislative power, without any express, specific grant of power, and without any express limitation, would have conferred this unlimited power.— *See* 1, *Kent's Com.*, 448, *Sill v. Village of Corning,* 15 *N. Y.*, 303.—These principles have been fully recognized by this Court in *Scott v. Smart's Ex.*, 1 *Mich.*, 306, 307; *Williams v. Mayor of Detroit*, 2 *Mich.*, 560; *and People v. Gallagher*, 4 *Mich.*, 244.

"From these principles it follows, as a corrollary, that an act of the State Legislature not prohibited by the express words of the constitution, or by necessary implication, cannot be declared void, as a violation of that instrument."

With these preliminary observations I proceed to an examination of the specific question involved in the present case: Does the constitution prohibit the Legislature from authorizing, as they purport to have done by this act, the qualified electors of this State, who may be in the military service of this State, or of the United States, to vote for officers of the State and National Governments at any other place than the township in which they respectively reside, and while they are absent from such township?

Article seven, section one, of the constitution is in the following words:

"Section 1. In all elections, every white male citizen, every white male inhabitant residing in the State on the twenty-fourth day of June, one thousand eight hundred and thirty-five; every white male inhabitant residing in this State on the first day of January, one thousand eight hundred and fifty, who has declared his intention to become a citizen of the United States, pursuant to the laws thereof, six months preceding an election, or who has resided in this State two years and

13 MICH.— K.

six months, and declared his intention as aforesaid, and every civilized male inhabitant of Indian descent, a native of the United States, and not a member of any tribe, shall be an elector and entitled to vote; but no citizen or inhabitant shall be an elector, or entitled to vote at any election, unless he shall be above the age of twenty-one years, and has resided in this State three months, and in the township or ward in which he offers to vote ten days next preceding such election."

The whole question turns upon the last sentence of this section: "But no citizen or inhabitant shall be an elector, or entitled to vote at any election, unless he has resided in the township or ward in which [he offers to vote, ten days next preceding such election."

As the constitution derives its force from its adoption by the people, we should, in its construction, seek only for the sense in which it was understood by them. As we have no other means of ascertaining the sense in which they understood its provisions, except the plain, natural, ordinary and popular meaning of its language, this must be our guide, without seeking for any hidden, strained or metaphysical meaning, of which the language might possibly admit. Thus understood in its natural, ordinary and popular sense, does this provision have the effect to prohibit electors from voting, when absent from the township in which they have resided, for ten days next preceding the election?

It is insisted by the counsel for the relator that the whole purpose of this section was to prescribe the qualifications of electors, and the period of residence required, and not the place where the election should be held, or the ballot deposited by the voter; that the place is only mentioned incidentally as connected with this leading idea; that, at most, it is but a constitutional recognition of townships and wards as places of voting, which was not intended to prohibit elections being held

elsewhere; that there is no express prohibition against a qualified elector voting at any other place, whether within or without the State, if the Legislature see fit so to provide, and that the phrase, "in the township in which he offers to vote," means only the township by virtue of his residence in which he claims the right to vote, for all officers who might be voted for at an election there held. This is the theory of the act in question, as is apparent from its whole tenor, and the only theory upon which it can be maintained.

It can hardly be contended that such is the meaning naturally presented to the mind by the language of the provision, used in its direct, ordinary and popular sense. And to warrant the conclusion that such was the sense in which it was understood by the people, it would seem there ought to be found something peculiar in the previous history of the State, or of this provision, or of the popular discussions upon it, showing the probability that it might have been thus understood. Construing the provision in the light of the history of the country up to the time of its adoption, it must be evident to every unbiased mind that, by the terms, "to vote" or to "offer to vote," in a township or ward, would, in any of the American States whose institutions could be supposed to have any influence upon the popular mind here, be at once understood a personal presentation of the vote at that place to the inspectors or officers presiding at such election. Such had been the uniform mode in all the American States from their first organization, with the single exception, so far as I am informed, of one isolated legislative act in Pennsylvania, passed during the last war with Great Britain, enabling her soldiers to vote. Such also had always been the practice in this State, and such would be the meaning of the terms at common law. And no one in any of the States would

have thought of claiming the right to vote otherwise,, under any provision of a constitution, or a statute, which merely, in general terms, authorized electors to vote at, in or for, any particular place. All would have understood that, to enable them to vote while absent from such place, would require some special affirmative provision for such a case.

Now, so far from there being anything peculiar in the history of this State, or of this provision, to warrant the belief that the people understood the terms here used as not indicating the place where the elector must perform the act of voting, the conclusion from such history is, to my mind, peculiarly strong the other way.

By our first constitution of 1835, Art. II., Sec. 1, after prescribing the personal qualifications of electors, and six months' previous residence in the State, it was declared: "But no such citizen or inhabitant shall be entitled to vote, except in the district, county or township in which he shall actually reside at the time of such election." Under this provision, an elector might vote for any State officer, or for President and Vice President, at any place in the State; or, for any district or county officer, at any place in the district or county, though absent from his residence; but he could not vote for township officers out of the township of his residence. But the people seem to have become dissatisfied with this provision, on the ground, probably, that it opened a door to fraudulent voting, by enabling a person to vote more than once at the same election, and making it difficult to detect the fraud. The Legislature of 1838, therefore, submitted to the people, at the election of 1839, the following amendment: "That so much of the first section of the second article of the constitution as prescribes the *place* in which an elector may vote, and which is in these words, to wit: 'Dis-

trict, county or township,' be abolished, and that the following be substituted in the place thereof, to wit: ' Township or ward.' " It is clear that the Legislature and the people, in adopting 'this amendment, understood it to refer to the place of voting, for the act submitting it to the people expressly so declares. It is admitted by the counsel for the relator that, under the constitution of 1835, as thus amended, the words did indicate the place of voting, and that it would not have been competent for the Legislature to have passed the act now in question, authorizing electors to vote elsewhere. Now, let us compare the constitution of 1835, as amended, with the provisions of the present constitution. The language of the first is: "But no citizen or inhabitant shall be entitled to vote, except in the township or ward in which he shall actually reside at the time of such election." Of the present constitution, the language is: "But no citizen or inhabitant shall be an elector, or entitled to vote at any election, unless he has resided in the township or ward in which he offers to vote, ten days next preceding such election." The only difference which I can perceive in the effect of these provisions is that, by the latter, the residence in the township or ward is required to be for ten days, and by the former actual residence only is required. And I must confess my entire inability to discover any theory of construction upon which an elector could be allowed to cast his vote out of the township or ward, under the one, which would not equally give him the same right under the other; nor have the eminent counsel for the relator been able to suggest any which is at all satisfactory to my mind. If, under the present constitution, the offering to vote in a township or ward means only the voting, or offering to vote, by virtue of his residence, so that his vote shall take effect there, or if it be susceptible of that meaning, I cannot see

why this is not equally the case under the former constitution, as amended; for, upon this construction, the voting, or offering to vote, would be equally *in the township* of the elector's residence.

But it is said there are negative words in the provision of the former constitution as amended, which expressly prohibit the voting elsewhere, and that in the provision of the present constitution there are no such negative words. If this be true, I do not see how it could alter the effect of the former constitution, if voting out of the township may be construed as voting within it—for this would get rid of the prohibition. It is true that, in this provision of our present constitution, it is not expressly declared in so many words that no elector shall vote elsewhere than in the township or ward in which he has resided ten days next preceding such election; but the sole question is, whether the language used is not, in its effect, equivalent to these express words, or whether the prohibition is not a necessary implication from the words used? If clearly and necessarily implied, it is as much a part of the constitution as if expressed in the most forcible language. There are many such implications in every State constitution. Thus, for instance, if a constitution prescribe the time for holding an election for certain officers, or the mode in which it shall be conducted, it would be merely preposterous to say that, because it had used no negative words, therefore the Legislature were not prohibited from authorizing it to be held at a different time, or in a different manner. But we need not go out of this section for implications of this kind. Thus, any "white male citizen" of twenty-one years of age, who has the requisite residence, is declared to be an elector. It is not expressly declared that no negro shall be an elector, yet no one ever doubted that negroes were excluded by the affirmative provision in

favor of the whites. And the same may be said of every other class of persons whose qualifications, as electors, are prescribed in the affirmative only. Because it would be merely absurd to suppose the framers of the constitution, or the people, would have so carefully specified the particular qualifications of each class of persons entitled to vote, if it was intended they should have the *same* right *without* such qualifications.

But unless the offering to vote, required by this provision, can be construed in the enlarged and metaphysical sense of claiming the right of voting by virtue of his residence in a particular township or ward, without reference to the place of asserting the right or the place of election, then I think the negative words are just as strong, and the prohibition quite as express and direct, under the present provision as under the amendment of 1839. For, if the offer to vote here spoken of, in connection with the place, implies the personal presence of the voter, it is impossible to give effect to the express words of the provision without denying the right of the elector to vote while absent from the township or ward of his residence. The language is negative and prohibitory: "But no citizen or inhabitant shall be an elector or entitled to vote at *any* election, unless he has resided in the township or ward in which he offers to vote ten days next preceding such election." This, upon any fair and natural construction, is exactly equivalent to saying: "No citizen or inhabitant shall be entitled to vote at any election," who does not offer his vote in the township or ward in which he has resided the specified period. To entitle the elector to vote, he must, then, do something which, within the meaning of this provision, will constitute an offer to vote within the township or ward of his residence; and this would be required even upon the theory of the relator's counsel. To meet this view, it is contended that the voting

elsewhere is an assertion of his right, or offer to vote, in virtue of the right conferred by his residence in the township, and that this is equivalent to an offer to vote in the township, etc. Now, if this act applied to township elections, and the ballots were, by the act, required to be sent to, and canvassed in, the township or ward, there might be some plausibility in the argument. But even that plausibility is wanting here, as the act does not apply at all to township elections. The ballots are not sent or canvassed there. They are sent to the Secretary of State, canvassed by the Board of State Canvassers, and abstracts sent to the Boards of District and County Canvassers, but not to the township or ward; and these townships and wards, as such, are in no way affected by them.

Again, if the construction urged by the relator's counsel be correct, that the elector, by virtue of his residence in any particular township or ward, can be authorized to vote any where for the same officers he might vote for when there present, then the effect of the present constitution will be the same as that of 1835, before the amendment, so far as relates to voting for state, county and district officers. Now, I cannot bring myself to doubt that, in view of the amendment of 1839, avowedly for the purpose of confining the elector's right to vote within the township of his residence, this provision of the present constitution, so similar in its language and apparent purpose, was understood by the people as intended to have the same effect, so far as regards the place and act of voting. I am entirely satisfied that the people must have understood both to deny to every elector the right of voting at any other place than the township or ward of his residence, or while absent from such residence.

I am, therefore, reluctantly brought to the conclusion, that the act is in direct conflict with the constitution, and for this reason void.

TWITCHELL v. BLODGETT.

In reaching this conclusion, I have not deemed it necessary to attempt to base my opinion upon any of the decisions cited from other States, upon similar laws; because upon a careful examination, I do not think they tend to throw much light upon the present case. Only three of them were made under constitutions bearing any resemblance to our own on this point; and the previous history of all those States was different from ours. The constitutions of Iowa and California are identical with each other in this particular, but not with ours. In the former State the law, which was much like ours, has been decided to be constitutional; in the latter, the reverse. In Pennsylvania, whose constitution in this particular is most like our own, a somewhat similar law has been held to conflict with the constitution. And, while I think the conclusion at which the Court arrived was correct, I am compelled to think that conclusion weakened rather than strengthened, by considerations of the inexpediency of the law and the dangers to be apprehended from it, which are apparently urged as a part of the grounds from which the conclusion of its unconstitutionality was drawn, thus exhibiting a strong hostility to the law, had it been free from constitutional objection. In this view, so prominently put forth by that Court, I cannot concur. I am disturbed by no apprehensions of danger from allowing our citizen soldiers to exercise the elective franchise, and to exert their due influence in the government and institutions of the country, for the preservation of which they are willing to offer up their lives. Nor can I perceive the justice or wisdom of that policy which would confine the right of suffrage to the less patriotic who remain at home in this hour of our country's peril. But the remedy is to be found only in an amendment of the constitution.

The judgment should be for the respondent.

COOLEY J.:

A legislative enactment being attacked in this case as opposed to the fundamental law of the State, it becomes necessary not only to examine it in the light of that fundamental law, but also to consider once more some of the rules of construction which are to apply where a Court is called upon to perform so solemn an act as to nullify the action of a co-ordinate department of the Government, on the ground that it has exceeded its constitutional jurisdiction.

It is conceded to be the settled doctrine of this State, that every enactment of the State Legislature is presumed to be constitutional and valid; that before we can pronounce it otherwise we must be able to point out the precise clause in the constitution which it violates, and that the conflict between the two must be clear or free from reasonable doubt; since it is only from constitutional provisions limiting the legislative power and controlling the legislative will, that we derive authority to declare void any legislative enactment. — *People v. Gallagher*, 4 *Mich.*, 244; *Sears v. Cottrell*, 5 *Mich.*, 251; *Tyler v. The People*, 8 *Mich.*, 333. — And the rule so well settled here is not left in doubt by decisions elsewhere.

It is contended, however, by the counsel for the respondent that the reasonable doubt of conflict upon which a Court may act in refusing to set aside a law must be doubt which springs from a consideration of the law after the meaning of the constitution has been judicially determined; that the first duty of the Court is to construe the clause in the constitution supposed to be violated, and having, through whatever doubts may have existed, advanced to a conviction of its purpose and meaning, to then apply the law to the purpose and meaning thus determined, and annul it unless there remain reasonable doubt of the conflict. Any other rule, it is said, may leave the meaning of a clause in the

constitution unsettled, making it one thing at one time
and another at another, according to the varying con-
structions of the legislative department. That there is
some force in this argument is unquestionable, but a
very slight examination will show that if the Courts
were to adopt it, and were in all cases to first fix and
settle definitely upon the meaning of the constitutional
provisions which are questioned, the rule of construction
which requires a legislative act to be presumed valid
would be greatly weakened if not entirely overthrown.
For the rule itself proceeds upon the idea that the leg-
islative construction is to be presumed correct until the
contrary satisfactorily appears, and that the Courts are
to yield to that construction when embodied in the form
of law, except where the law and the constitution are
so plainly in conflict that the two cannot stand together.
When, therefore, a repugnancy is claimed to exist be-
tween them, the Courts must examine and construe the
provisions of each in the light of the other, and they
must sustain the law if they have reasonable doubts of
the conflict, even though the doubts spring from a
construction of the constitution itself. — *Sun Mutual In-
surance Co. v. The City of New York,* 5 *Sandf.,* 14;
*Clark v. The People,* 26 *Wend.,* 606; *Mayor, etc., of Bal-
timore, v. The State,* 15 *Md.,* 457 – 8. — The evils that may
spring from this rule are not so great as might be im-
agined, for where a construction has been placed on a
constitutional provision, it is reasonable to expect that it
will be followed even though its original adoption may
have sprung from deference to legislative action rather
than from settled convictions in the judicial mind.

In the case before us the precise portion of the con-
stitution alleged to be violated is pointed out, and the
repugnancy is claimed to be clear. It is the first sec-
tion of article seven of the constitution, which, after
providing what citizens and inhabitants shall be electors

and entitled to vote, proceeds: "But no citizen or inhabitant shall be an elector and entitled to vote at any election, unless he shall be above the age of twenty-one years, and has resided in this State three months, and in the township or ward in which he offers to vote, ten days next preceding such election."

The act which is supposed to conflict with this section is the act approved February 5th, 1864, entitled "An Act to enable the qualified electors of this State in the military service, to vote at certain elections, and to amend sections forty-five and sixty-one of chapter six of the Compiled Laws." The general purpose of this act was to enable the electors of the State who were absent from their places of residence in the military service of the United States, or of this State, to exercise the right of suffrage in all the general elections of the State, notwithstanding such absence. I shall state its provisions sufficiently for the purposes of this case, if I say that it authorizes polls to be opened wherever a Michigan regiment or other organized body of soldiers may be, within or without the State, on the day fixed for the general election, at which such electors may deposit their ballots for all the officers to be voted for at such election, specifying on the ballots the county and township or ward for which such elector claims to vote; that it provides for returns from these polls to the State canvassers, to whom the original ballots are also to be sent; that it then directs the State canvassers to prepare an abstract of these returns, and transmit to each county and district board of canvassers a statement of the votes cast by electors resident in such county or district for the various county and district officers; and that it makes further provision for the canvass by the State canvassers of all votes for such State officers, and by the county and district boards of those for county and district officers respectively. Provisions are also

made to secure the elective franchise against fraudulent practices, as well by those who exercise it as by any other persons.

This law is claimed to be unconstitutional because, it is said, the latter part of the section above quoted from the constitution requires the personal presence of the elector in the township or ward in which he resides at. the time of asserting his right to vote.

On the other hand, it is evident that the law proceeds upon the idea that the *place* where the elector shall be when he exercises the right of suffrage, in all the *general* elections of the State at least, is not fixed by this section; and counsel for the relator contend that it only prescribes the *qualifications* of electors, leaving the *conditions* under which they shall exercise their right to be fixed by the Legislature.

With these conflicting constructions before us the counsel for the respondent have pressed upon us the history of this constitutional provision, in the belief that it will, with much conclusiveness determine the construction of the section, by giving us the original clause, the evil that existed under it, the change to correct that evil, and the intent of the subsequent modifications which must have been made with the evil in view, and with the purpose to continue the safeguard against it.    That such history may be looked to for this purpose, and the proceedings of the constitutional convention examined in the endeavor to discover the probable intention of the framers of the constitution as we now find it, is well settled. — *Clark v. The People,* 26 *Wend.,* 602, *per Walworth, Chancellor.*

We find, then, on looking into this history, that the constitution of 1835, after fixing the qualification of electors, added the negative clause that " no such citizen or inhabitant shall be entitled to vote, except in the district, county or township in which he shall actually

reside at the time of such election."—Art. 2, §1. The
evil supposed to exist under this provision was, that an
elector might vote anywhere in the election district; and
as that district for the election of State officers was the
whole State, and for county officers the whole county, he
might, for those officers, vote anywhere in the State or
county, as he. might also, for member of Congress, any-
where · in the congressional district; and the usual safe-
guards, by challenge, etc., were rendered of little value,
if he saw fit to vote where personally unknown. The
people remedied that evil by an amendment, adopted in
1839, which substituted for the words, " district, county
·or township," the words, " township or ward " — thus
clearly requiring the personal presence of the elector
in the township or ward of his residence, as a con-
dition of the right to vote.

Thus stood the section at the time the constitutional
·convention of 1850 met. And here I must remark, that
the light to be derived from an examination of the pro-
·ceedings of constitutional conventions, on questions of
constitutional construction, is commonly vague and incon-
clusive, and not to be allowed, in any case, to control
the meaning of unambiguous terms. And I have care-
·fully examined the proceedings of this convention in
reference to this provision, and have come to the
·conclusion that, while a plausible argument may be
·drawn therefrom, that the convention designed to retain
the principle introduced by the amendment of 1839, one
equally plausible is afforded, that it was designed to be
abandoned. I do not present the considerations which
lead me to this conclusion here, as they are unimportant
to a decision, and I allude to them only to show how
little reliance can be safely placed upon such evidence.

If, however, by an examination of these proceedings,
we had succeeded in ascertaining definitely the intent of
the convention, we might still be far from the intent of

the people in adopting their work. That intent should be gathered from the words embraced in the instrument as adopted, if those words -are free from doubt. The people, in passing upon it, looked only to the clauses as they then stood, without troubling themselves with the considerations, or the accidental circumstances, that may have brought them to their present form.

What we have learned, then, in our examination of the history of this subject is, that there was an evil existing under the old constitution, which was obviated by adopting the principle that the elector should vote in person, in the township or ward of his residence. We are now to ascertain, from the words employed in the clause as it stands, whether this principle is retained, or whether, on the other hand, a design is apparent to discard it. I hazard nothing in saying that the first impression to strike the mind on reading the clause " in which he offers to vote," is, that it is synonymous with " in which he personally presents his ballot." Few persons, if any, would be immediately impressed that the words were ambiguous, and might mean something else. Still fewer would discover in them such an evident purpose to discard the principle of the amendment of 1839, as would be naturally expected to appear if the purpose existed. If I am right in this, then further examination, with a - view to find some other and more subtle meaning, ought to be made with extreme caution, lest we deceive ourselves into disregarding the plain and obvious sense for some other, which only ingenuity discovers and suggests.

There are certain well-settled rules for the construction of statutes, which no Court can safely disregard. Where the statute is plain and unambiguous in its terms, the Courts have nothing to do but to obey it. They may give a sensible and reasonable interpretation to legislative expressions which are obscure, but they

have no right to distort those which are clear and intelligible. The fair and natural import of the terms employed, in view of the subject matter of the law, is what should govern. — *Bartlett v. Morris*, 9 *Port.*, 266 ; *Wilkinson v. Leland*, 2 *Pet.*, 662 ; *Holbrook v. Holbrook*, 1 *Pick.*, 250 ; *Pearce v. Atwood*, 13 *Mass.*, 342–4 ; *Barker v. Esty*, 19 *Vt.*, 131 ; *Ezekiel v. Dixon*, 3 *Kelley*, 146.

These rules are especially applicable to constitutions; for the people, in passing upon them, do not examine their clauses with a view to discover a secret or a double meaning, but accept the most natural and obvious import of the words as the meaning designed to be conveyed. They will ratify an instrument in this sense, even though it may have been drawn and adopted by the convention in some other.

But the argument for the relator is thus stated by his counsel: "The express and evident object of this section is to prescribe the *qualifications* of electors. After doing so generally, it is added, in the nature of a proviso, that they shall not be deemed such electors in any other district than that of their residence. The alternative is, *any other township or ward:* that the elector's vote shall be received and have effect in the township or ward of his residence. It was intended to prohibit the practice of voting for State officers, etc., in some other district, and to prevent soldiers, sailors, etc., influencing and controlling the local government of places where they happen to be, as had often been attempted, on the one hand ; and to preserve the full franchise of citizenship at their proper place of residence, on the other. There is no attempt to prescribe anything concerning the single fact of the bodily presence of the person. The substantial provision is, that the elector shall have resided in his township or ward ten days, and not that he shall vote in any

particular manner." And this view is supposed to be so far fortified by adjudged cases, that the Court may well adopt it as the rule of decision here, even if not fully agreeing with it.

We are referred to decisions upon laws passed to accomplish the same purpose as this, which have been made by the Courts of Pennsylvania, Connecticut, New Hampshire, Vermont, Ohio, Wisconsin, Iowa and California, several of which have sustained legislative provisions for taking the votes of electors out of the State. One naturally comes to an examination of these cases, in the expectation of finding them somewhat analagous to the one before us; but a careful examination of them all compels me to say that the constitutions under which these decisions were made were so different from our own that no one of them will support the law here under discussion.

I have no hesitation in holding that when the time, place and manner of holding elections are not prescribed by the constitution, they are within the discretion of the Legislature, and the reception of votes from persons actually out of the election districts, or even of the States, may be allowed by statute. Applying this principle to the constitutions of Ohio and Wisconsin, we cannot well doubt the validity of their statutes, and I regard the decisions made to that effect as entirely correct and satisfactory. The New England opinions, on the other hand, which hold similar laws invalid, are based upon constitutional provisions, clearly fixing the locality, and their correctness is equally beyond dispute. No one of these adjudications has any bearing upon the question before us.

There is more ground for supposing that the decision of the Supreme Court of Iowa is in point, and if I could find that it was so, I should hesitate long before coming to a conclusion directly opposed to that of so

able a Court. The clause in the constitution of that State under which the question arose, was as follows: "Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State six months next preceding the election, and of the county in which he claims his vote sixty days, shall be entitled to vote at all elections which are now, or may be authorized by law." The difference between this clause and that in our constitution, so far as here material, is that ours requires a residence "in the township or ward in which he offers to vote;" and that of Iowa requires an elector to be a resident of "the county in which he claims his vote." There is the difference as to the *district*, between "township" or "ward" and "county," and the difference between "offering to vote" and "claiming his vote." I shall not stop to remark upon this last difference; for though I agree in the distinction taken by the Supreme Court of Iowa, yet it is not necessary to comment upon, or critically consider the meaning of each, since if the phrase had been "claims his vote" instead of "offers to vote" in our constitution, I think the result in this case must still have been the same.

But the difference between the two constitutions, as to *district*, is more important in the examination of this law. The law itself, as we are told, is copied from that of Iowa, and must have assumed that the two constitutions were substantially identical. But when we come to put upon the phrase "offers to vote" the same meaning given by the Court in Iowa to the words "claims his vote," we shall find that this meaning, applied to this law, will not sustain it. For there is no provision in this law anywhere that "the soldiers vote shall be received and have effect in the township or ward of his residence." The votes are never to be returned to the township or ward, and never have effect there. As the

law does not apply to township elections, no township officers can be elected under it. The votes are canvassed by State, county and district canvassers, but never by township or ward canvassers. They have effect in districts but not in townships; and the votes cast abroad by the electors of one township in a district, are to be counted and "have effect" in that district with and in all respects like votes cast in any other township in the same district. To hold that this satisfies the meaning of the constitution, would be to hold that the words "township or ward" are synonymous with "district," and that the change of terms made by amendment in the old constitution, for the avowed purpose of changing the effect, did not alter the constitution. The law proceeds all the way through on the idea of recognizing only the election district of the State for all the purposes of receiving, counting and giving effect to the votes. The township or ward residence is indeed taken notice of for the purposes of registry, and the soldier is required to state it upon his ballot; but this might have been required under the constitution of 1835, when the elector was claiming his right anywhere in the district.

We cannot, therefore, regard the polls opened under this law as township and ward polls, as has been suggested to us. They are not township or ward polls in any sense. They are State polls, at which electors from all parts of the State are to deposit their ballots together, to be counted at these State polls, but to be finally canvassed and have effect in the several election districts, and not in the townships or wards. And the decision which sustains the Iowa law cannot be made to sustain the one in question, in view of the plain difference in result between the words "district, county or township," and "township or ward," designed to be produced in the substitution of the latter for the former, in the constitution.

TWITCHELL *v.* BLODGETT.

Attention was called on the argument, to a supposed legislative construction of this constitutional provision by former laws, and we were pointed to several enactments authorizing certain townships to hold their township elections within the limits of cities which had been so carved out of their territory as to render it inconvenient to hold them elsewhere. So far as I know, these enactments were adopted without special attention being called to this question, and I can well conceive that the person drafting them might suppose the word "township" could be construed to include territory carved out of the township limits, and still encircled by it. I have examined these laws, and think it apparent that this was precisely the construction placed upon them. For while each of them authorizes a township election to be held outside of the township, no change is made in the general law as to the oaths to be administered to a person challenged; and, under that law, he would be required, while standing at the polls, within the city limits, to make oath that he is "a resident of *this township*,"— the township where he stands. *See Laws of* 1859, *pp.* 391 *and* 875; *Laws of* 1861, *p.* 365; and compare *Compiled Laws* §§ 529 *and* 49.

But if these laws were valid they could have little force on a question of constitutional construction. They are not cotemporaneous expositions, and, in my opinion, they clearly conflict with laws which were cotemporaneous, and which expressed the understanding as well of the Legislature as of the people. I refer to the election laws, passed in 1851, to give effect to this very section, and which, in the oaths they require, plainly declare a construction requiring the personal presence of the elector in the township or ward of his residence at the time of tendering his vote for reception. — *Com. Laws*, §49 *and* §128. — It is clear that the Legislature, in requiring the person challenged to make oath that he resides " *in this*

*township or ward,*" did not understand that they were annexing to the right of suffrage any condition not required by the constitution, for the inspectors are first to declare to such person "the constitutional qualifications," and the oath is to be administered if he claims to possess them.

I have left entirely out of view in this discussion all questions of expediency, as belonging exclusively to the legislative department.   Not in the least doubting that the motives which dictated this law were pure, that the care with which its provisions were framed to preserve the purity of elections would have secured that object as effectually as the nature of the case would admit, and that the persons to whom the exercise of the right of suffrage was sought to be preserved, were, if distinction were to be made between electors, entitled especially and preëminently to a voice in our elections, I am yet constrained to say that a careful comparison of this law with the constitution, in the light of all the decisions and other considerations that have been supposed to have a bearing, leaves upon my mind no reasonable doubt of their conflict.   Any process of reasoning which arrives at a different conclusion, is, in my opinion, logically false, and if embodied in a judicial decision, would establish a precedent which in the future might be seized upon as a justification for more serious perversion of constitutional language, until that principle of constitutional permanency and inviolability, which, in times like these, constitutes the anchor of our safety, will cease to have force, and the temporary will of the majority will be practically uncontrolled.   And, believing as I do, that a high and sacred regard for law and constitutional order is being begotten of these times, I regard it as especially important that the judiciary should do nothing to postpone or to check this result by decisions which strain or bend the meaning of words to meet unexpected emergencies.

MARTIN Ch. J.:

The constitutionality of the act of February 5, 1864, is the sole question submitted to us. This act was intended to enable, and does enable the qualified electors of this State, who may be abroad in the military service of the United States, to vote at certain elections, notwithstanding such personal absence, and makes provision for the time, place and manner of voting, and for such safeguards against fraud, as the legislative judgment regarded necessary to secure an honest vote, and an honest canvass of such vote. It was intended to recognize and enforce the idea that a citizen voluntarily, or otherwise, abroad upon military duty, for the purposes for which our soldiers now are, has still a home, and home rights preserved to him, and that patriotism and loyalty are no cause for disfranchisement. Had the Legislature power to pass such an act? This is the sole question, and is to be tried by the constitution. Now what is a constitution and what is its office and controlling power? That of the General Government is a delegation of powers; that of the State, a restraint upon power, and which, so far as legislative power is involved, would, without such restraint, recognize in the Legislature, omnipotence. In the case before us, has legislative discretion or power been restricted, if so, how far? In considering this question, we must be careful to confine ourselves within the strict limits of judicial power. The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all Courts, is coupled with responsibilities so grave, that it is never to be exercised except in very clear cases: for one department of the Government is bound to presume that another has acted rightly; and the party who wishes to pronounce a law unconstitutional, takes upon himself the burden of proving, beyond any doubt, that it is so.

It is also very well settled that no statute is unconstitutional, merely because it is wrong in policy or

principle. It is not enough that it is contrary to sound public morality, or injurious to private rights. Inconsistency with rules of law, or principles of equity, will not make it void. · Nothing will have · that effect but a *direct* collision between its provisions and the constitution. — See 2 *Casey*, 300 ; 9 *Harris*, 160, 164.

And so, on the other hand, in interpreting a constitution, it is to be read as it is written. It should not be construed, for it is a rule for construction of statutes. If construction of the constitution were permissible, we might as well have no constitution, as in such case, if it expresses no clear and definite idea, in positive language, it expresses nothing which can be a rule of construction. "Judicial glosses and refinements are misplaced when laid on it. Carefully considered judicial implications may, indeed, be made from a constitution in support of statutes, *but never to defeat statutes*, when such implications are grounded in the constitution itself, and tend to accomplish its obvious purposes, as well as to promote the public good." Upon this principle, why may not such implications be made to preserve a right to the citizen, never surrendered nor abandoned, and which, as I will attempt to show, the constitution clearly recognizes and preserves to him.

Now, what are the provisions of the constitution which are supposed to be violated? Sec. 1st of Art. 7 of the constitution of 1850, relates solely to the qualification of electors, and prescribes no rule respecting either the time, manner or place, of voting. All this is left to legislative discretion, and legislative action is requisite to enable the elector to vote anywhere. It simply declares that every white male citizen, etc., and others possessing certain qualifications, shall be electors, and entitled to vote; but that "no citizen or inhabitant *shall be an elector, or entitled to vote* at any election,

unless he shall be above the age of twenty-one years, *and has resided* in the township or ward *in which he shall offer to vote,* ten days next preceding such election." The second section requires that all votes shall be by ballot, except for township officers, etc.; but the form of the ballot, and the manner in which it may be offered, or · deposited, is not prescribed. This, again, is left to legislative discretion and control.

But it is said and urged that the ballot should be delivered by the voter in person, and that the requirement of a vote by ballot, shows the intention of the people to be, that the elector should be personally present. No such intention is expressed, and if the ballot shall be delivered personally, it is because the Legislature so determine. Voting by proxy, by ballot, or otherwise, is recognized by law, and few members of corporations vote otherwise. As the place where the vote shall be given, and the mode of depositing the ballot is left to legislative control, and personal presence is not made necessary, no constitutional objection ,can be raised to the exercise of the power to vote by ballot, in any manner the Legislature may prescribe in its discretion. In fact, the Legislature has full scope and control over the subject, and with its action we cannot interfere. The third and fourth sections have · no especial bearing upon the question before us, for their provisions may as well be executed in one place as another. The fifth section provides that no elector shall be deemed to have gained or · lost a residence by reason · of his being employed in the service of the United States, nor when under certain other conditions. The section preserves the *status* and right of the elector, and contains no prohibition upon his voting when and where the Legislature may authorize him to vote, and prescribe how he may do so. The soldier is not a disfranchised citizen unless the constitution expressly makes him such, and I should

long hesitate before I would, by implication, engraft such a provision upon that instrument. If the subject be left to legislative discretion no other than legislative power can disqualify him to vote, or deprive him of this high privilege of citizenship. If the person offering to vote be qualified by age, citizenship, and residence, the Legislature may determine how and where he may cast his ballot, and in what manner it shall be received and disposed of, and how canvassed. Can we, upon any sound judicial principle, hold that an election in the army is any the less a legal one, or the soldiers less entitled to the privileges of electors, than persons remaining at their homes, if the Legislature is endowed with the power to fix the place and prescribe the manner of balloting and of canvassing votes? I think not.

By section six the Legislature is authorized to pass laws to preserve the purity of elections, and to guard against abuses of the elective franchise. This gives to the Legislature, as I think, when considered in connection with the sections above commented upon, supreme control over the entire subject of time, place and manner of voting, and subsequent canvassing of votes, as the only positive rule of the constitution respecting votes is that they shall be by ballot. If a *viva voce* vote were allowed, it would be impossible to avoid the conclusion that the framers of the constitution intended that votes should be cast personally, and not otherwise; but a ballot may be deposited as the Legislature sees fit to authorize the deposit. A prohibition cannot be implied from words expressly designed and intended as descriptive of or qualifying a power or right, when legislative action is contemplated, and necessary to secure the exercise of such right or power. The whole subject is left to legislative discretion. And this power of the Legislature has been frequently exercised, and never with disapprobation by the Courts or the people. Thus, the

qualified voters of certain townships, as Marshall, Niles,
Ypsilanti, Lansing, and others, are authorized by law to
vote outside of their townships, and within the corporate
limits of cities carved out from such townships. Why
is this, except that the constitution fixed no place where,
and only where, the vote should be deposited, leaving
the whole subject to legislative discretion and action?
It will be extremely difficult for any citizen of either of
such townships, who casts township votes in cities, to
explain why, as he cannot swear that he has been a
resident of the ward of the city in which he offers his
vote, for any period of time, and yet may vote, the Leg-
islature has no right or power to confer upon the sol-
dier in the field or hospital, a like right to deposit his
ballot away from his special place of residence. If the
views of my brethren be correct, the one is as far, in
legal contemplation, from his place of residence as the
other, and if one retains residence and the right of an
elector, why does not the other? In my opinion the consti-
tution limits legislative power only so far as regards the
qualification of electors, and the manner of voting, viz:
by ballot, leaving the whole subject of the offer of the
ballot, and its canvass, to legislative discretion. It is
certainly competent for the Legislature to prescribe the
mode, time and place of the vote, and how and with
whom it shall be deposited. Can we say that the Leg-
islature, in making provision for the emergency of the
soldiers' voting, has exceeded its power, or come in con-
flict with a constitutional restriction, when the whole
subject is left to its discretion? Were the Legis-
lature to make provision that, in case of sickness or
other disability of an elector, the inspectors of election
might convey the ballot-box to him and receive his
vote, could any one question the power of the Legisla-
ture to do this, or challenge successfully the vote for
this cause? If the Legislature can do this, why cannot

TWITCHELL *v.* BLODGETT.

provision be made by it for the vote of the soldier, as has been done, all of whose rights of residence and citizenship have been carefully preserved to him by the constitution? There is nothing in reason, or in the nature of our political institutions which should or does prevent the soldier, who leaves family, home and friends, and risks life and limb for the preservation of the integrity of the Government, from voting, or which should or can disfranchise him. He loses no residence by going into the field, nor any civil right; why should he lose any political right which he might have retained if he had only remained at home, and which it is competent for the Legislature to preserve to him? And I think the Legislature has power to preserve his right to vote, as fully as to save his property from sale under execution, while he is absent in the field, and to regulate the manner of voting, as fully as if he actually remained in his township or ward.

But it is said that this law originated from an extraordinary emergency of the times, and was not contemplated by those who adopted the constitution, and is, therefore, invalid. Admitting the premises, is the conclusion correct? The constitution was framed for the very purpose of adaptation to the progress of the times, and to be a general, not special, rule of action and restraint. A power not controlled or withheld abides in the people, and the Legislature is omnipotent in such case.

The flexibility of the constitution of the United States, and its perfect adaptation to every emergency, is a striking illustration of this idea. No argument, I therefore think, can be urged against the validity of this law, upon this ground; for the Legislature remains, and is made the sole judge of the necessity and propriety of action upon the occurrence of such emergency, and there is an obvious equity in the law

which should be regarded, unless the constitution clearly intends to prevent. But let us consider this constitution by another test, which has been applied by counsel in the argument of this question. The constitution of 1835, which was supplanted by the present one, contained peremptory prohibitory words respecting voting, except at a specially designated place. — See *Const. of* 1835 *and amendment, Rev. Stats.*, 1846. The framers of the present constitution omitted this peremptory prohibition. This must, under any rule of construction, be considered as deliberately and intentionally done. Why was there such intention? Obviously, to leave the subject to legislative discretion as emergency arose. The peremptory words of the old constitution were rejected, and the present constitution is confined to the subject of personal qualification. Can there remain any doubt, then, that the whole subject of the place of voting is within legislative jurisdiction?

The first impression, upon reading an instrument, is no guide to construction. It is to avoid that impression, that interpretation or construction becomes necessary. The great error, in considering the power of the Legislature over this question, is in assuming that the people, in adopting the constitution of 1850, assumed legislative power. This is not so. The details of a constitutional command or prohibition, are left with the Legislature to be put into shape, the constitution only establishing general principles by which legislation shall be guided. The Legislature has exercised this power, and a co-ordinate branch of the Government cannot assume to question or controvert it, unless the action of the Legislature be obviously and plainly in opposition to such constitution. If we admit the power to construe the constitution by implication, such implication is, in this case, as strong that the whole subject of time, place and manner of voting, (except that, in general elections, the vote shall

be by ballot,) is as much confided to legislative discre-
tion, as that a prohibition is implied, against voting,
except in a particular place or locality. That the con-
stitution may be construed by implication in special,
doubtful cases, I do not question; but who shall con-
strue it, when the act of the law-making power is
questioned, and a clear violation of its letter is not
manifest? Is there any provision in the constitution
which recognizes in the judiciary superior acumen to
that of the Legislature in interpreting words, which
have no technical signification, and when the power
of the Legislature to pass a law is alone questioned?
I have not been able to find such, nor to discover any
principle upon which a co-ordinate power can nullify
the act of another, except upon clear, indisputable
grounds, admitting of no inference or construction of
law. A very different rule applies to the interpretation
of the constitution upon a question involving legislative
power, and the construction of a legislative act, as it
affects persons and personal rights. A tribunal of co-
equal power with another, can never assume superiority
over one primarily invested with jurisdiction over the
subject matter. In such case, the latter is pre-eminent
and supreme.

The impressions and intention of the people, when
adopting a constitution, are only to be gathered from
the language of the instrument. That of the convention
framing it is of no value, for the people did not act
upon the opinions or intention of that body, but upon
individual construction of the instrument itself.

But again, in considering the language of the present
constitution, which prescribes, as a qualification of the
voter, that he shall have resided ten days in the town-
ship or ward in which he *offers* to vote, we must
remember that when words have no technical significa-
tion, and are susceptible of more than one meaning,

either of which is accurate, and the language used displaces some positive words of a former law, the construction of such language by the Legislature is as potent as our own. We cannot say that the Legislature is wrong; we must, therefore, say it is right, as it is the supreme law-making power. A prohibition cannot be implied from words expressly designed to be descriptive of, or a qualification upon a power or right, where legislative action is contemplated, and has been exercised, except in cases of gross, apparent error by that body; and then I hold that when, in a revising constitution, words in the old, embracing a particular class of cases, are omitted, this is evidence of an intent to change the law. — See 1 *Pick.*, 45; 4 *Gilm.*, 207; 31 *Maine*, 34.

It is said and contended that the decisions and adjudications of the Courts of other States can have little or no authority with us in determining the question submitted. I think otherwise, and that they have great weight in deciding this vexed question, not perhaps as absolutely binding, but as recognizing and establishing general principles, by which the interpretation of the constitution should be made. Now, let us consider some of them. In the case of *The Commonwealth v. Maxwell*, 3 *Casey*, 444, Judge Woodward, in giving the judgment of the Court, in applying the rules of interpretation to a law respecting the appointment and election of Judges supposed to conflict with the constitution of Pennsylvania, says, (and, I think, with perfect judicial accuracy,) "that from the general provision for the election of Judges, and the whole scope, tendency and object of the amendment, (to the law considered,) and especially from the limitation on the appointing power, we deduce an implication or inference that the penman meant that the vacancy should be filled by election, at the next general election. *I am willing to accept this as the very*

*idea in his mind. I think it is the sound construction of the instrument. Still it is only an implication, and I doubt if any act of assembly has ever been annulled for contravening an implied 'rule of the constitution.* In the last constitutional question," he says, "in this Court, it was said, nothing but a *direct* collision between the provisions of the statute and the constitution will have this effect. What is meant by such expressions? That the judiciary may set up their implications as of equal force with the letter of. the organic law? Or that the law must be in such plain conflict with the letter of the constitution as to be apparent to every reasonable mind when pointed out? If the former be meant, no man can tell what the constitution is from what is written, and we might as well have no written constitution; if the latter, then it is not a clear case of *direct* conflict." And he further says, (and, as I think, true in the case before us,) "no man can take the law in one hand and constitution in the other, and say that their *terms* clash. Whether the law conflicts with the *spirit and meaning* of the constitution, depends on what *we* declare them to be; and if we set up inferences which are inconsistent with the law, *let it be said that the law conflicts with judicial implication, derived from the constitution, rather than with the instrument itself.*" And Judge Gibson, in *Commonwealth v. Clark*, says: "A constitution is not to receive a technical construction, like a common law instrument or statute. It is to be interpreted so as to carry out the general principles of the government, not to defeat them; and to that end, its commands as to the time and manner of performing an act are to be considered as merely directory, whenever it is *said that the act shall not be performed at the time 'or in the manner prescribed, and no other.*" The conclusion is that, "when we construe a constitution by implication of such rigor and inflexi-

bility as to defeat the legislative regulations, we not only violate accepted principles of interpretation, but we destroy the rights which the constitution intended to guard."

In the opinion of the Judges of the Supreme Court of Vermont, this same view was adopted, and they held that when the constitution contained no positive prohibition upon Legislative action, nor any positive rule as to the time and place of voting, the will of the Legislature must prevail as to such vote, and its deposit, and canvass. This same idea is recognized in the case of *Chase v. Miller*, 2 *Am. Law Reg.*, new series, p. 146, where it is admitted that an election in a military camp *within the State*, could be held legal; but if we depart one foot from the polls, where shall we be compelled by the constitution to stop?

The case from the California Court is not accessible to me, and I can not, therefore, consider it. That of Iowa, *Morrison v. Springer*, 3 *Am. Law Reg.*, new series, 276, is, I think, on all fours with this before us, and the judgment of the Court in that case is not capable of controversion, and that Court holds and declares the law to be, that "if the constitution declares that a thing *shall be done* in a particular way or manner, it is implied, necessarily, that it shall not be done in any other; but that if there is no such *express* declaration, and none fairly to be implied, the whole subject is within legislative discretion," and this principle is fully recognized in the cases from New Hampshire and Connecticut, referred to by counsel. I regret that the proper limits of a judicial decision, prevent my making further comments upon these cases. They are worthy of careful reading and consideration.

Now, then, can we say that the Legislature has exceeded its power in enacting the law before us? We have seen that a constitution is — unlike statutory laws —

subject to no inferential interpretation by a Court to defeat legislative action, but that it must be strictly construed, and with the idea always present and predominant that legislative action is recognized and required, to effectuate and detail the popular will which the Constitution expresses. Such action the judiciary cannot question, except upon a clear conviction produced by considering the *letter* of the Constitution, that it was forbidden either by the letter, or by clear, unquestionable implication. The judgment of the Legislature is paramount to that of the Judiciary over every subject of which it has clear jurisdiction, and, in a doubtful case, the legislative will must prevail.

In this law which we are considering, we find the settled, determined and clearly expressed will of the people, and I cannot put my finger upon any word or clause of the constitution from which I can conclude that they have surrendered such will over this subject, or parted with a single right respecting the regulation of the time or place in which a qualified elector may vote.

We also find that the Judiciary of every State, before which this question has been presented, has invariably conceded the supremacy of the Legislature over the subject, unless expressly restrained by the constitution of the particular State within which the judgment was rendered, and that the whole question has been made to depend upon that of express constitutional prohibition or inevitable inference.

And in all, we find that the question is not free from doubt, and that, in some instances, considerations of policy and expediency, subjects with which the Courts have no control, have been employed to support opinions which hold the law invalid.

So long as this conflict of opinion as to legislative power over this subject exists, and I find myself unable

13 MICH.—M.

TWITCHELL *v.* BLODGETT.

to put my finger upon any express provision of the constitution which deprives the Legislature of the right to preserve the electoral privilege to our soldiers abroad, from public and vital necessity, I cannot hold that the Legislature has exceeded its authority, nor allow to judicial doubts more potency than to legislative certainty.

I think the judgment should be for the relator.